# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, AT NASHVILLE

| | |
|---|---|
| **BRYANT KROLL,** | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE CITY OF MILLERSVILLE, TENNESSEE,** | ) |
| **SCRIPPS MEDIA, INC. d/b/a NEWSCHANNEL** | )  **Jury Demand** |
| **5,** | ) |
| **PHIL WILLIAMS,** | ) |
| **LEVI ISMAIL,** | ) |
| **DUSTIN DARNALL, in his individual and** | ) |
| **official capacities,** | ) |
| **JESSE POWELL, in his individual and official** | ) |
| **capacities,** | ) |
| **DAVID GREGORY, in his individual capacity** | ) |
| **and official capacities,** | ) |
| **CRISTINA TEMPLET a/k/a CRISTINA** | ) |
| **ROSADO, in her individual capacity,** | ) |
|     **Defendants.** | ) |

## COMPLAINT

Table of Contents

*PARTIES*.................................................................................................................................*3*

*JURISDICTION AND VENUE*................................................................................................*5*

*ALLEGATIONS OF FACT* ......................................................................................................*6*

    **Background of Issues in Millersville, Tennessee and 2024 Changes in Leadership**...........................**6**

    **Plaintiff Begins Working for a New Administration Under Interim City Manager Tina Tobin**..**15**

    **Plaintiff's Public-Interest Reform Work In Millersville** .................................................................**24**

    **Coordinated Lawfare: Darnall, Templet, Powell, and Phil Williams Conspire to Disrupt City Operations and Weaponize Serial, Baseless BPR Complaints**...........................................................**26**

    **The May 20, 2024 Smear Campaign**....................................................................................................**30**

    **Politically Motivated Ouster of Mayor Long: Plaintiff's Representation as Core Private-Citizen Speech on a Matter of Public Concern** ....................................................................................................**38**

    **Plaintiff Never Generated or Admitted to Generating Reports Used by Shawn Taylor**...............**41**

    **October–December 2024: Election Interference** ................................................................................**50**

Protected Speech On Matters Of Public Concern ..................................................................55

Plaintiff's Protected Out-of-Court Statements on Matters of Public Concern and Defendants' Retaliatory Efforts to Silence Him ..................................................................61

The December 17, 2024 Ambush on Plaintiff ..................................................................62

Phil Williams' December 18, 2024 "Fresh Start" Article: Capstone of the Smear Campaign and Open Celebration of Plaintiff's Forced Removal ..................................................................66

The December 19 Special Call Meeting ..................................................................70

Phil Williams and the NewsChannel 5 Defendants Continued Campaign of Disinformation and Support of Kim Kelley to Attack Plaintiff via January 14, 2025 Article. ..................................71

*CAUSES OF ACTION* ..................................................................................................76

*COUNT I: First Amendment Retaliation – Speech, Petition, and Political Association 42 U.S.C. § 1983 (Against the City of Millersville and the Commissioner Defendants in their Individual Capacities)* ..................................................................................................76

*COUNT II: First Amendment Retaliatory Conspiracy under 42 U.S.C. § 1983 – Joint Action and Conspiracy Between State Actors and Media Defendants* ..................................................82

*COUNT III: Tortious Interference with Contract and Business Relationships (Against Defendants Phil Williams and NewsChannel 5 / E.W. Scripps)* ..................................................86

*COUNT IV: Defamation (Against Media Defendants and Individual Defendants)* ................90

*COUNT V: Defamation by Implication / Defamation by Innuendo* ..................................93

*COUNT VI: False Light Invasion of Privacy* ..................................................................96

*COUNT VIII: Civil Conspiracy (State Law)* ..................................................................98

*DAMAGES* ..................................................................................................101

*PRAYER FOR RELIEF* ..................................................................................................103

Plaintiff Bryant Kroll for his cause of action against the Defendants Phil Williams, Levi Ismail, Scripps Media Inc. d/b/a NewsChannel 5, Dustin Darnall in his individual and official capacities, Jesse Powell in his individual and official capacities, David Gregory in his individual and official capacities, Cristina Templet in her individual and official capacities, and the City of Millersville, Tennessee, states and alleges as follows:

## PARTIES

1. Plaintiff Bryant Kroll is an attorney duly licensed to practice in the State of Tennessee. He is admitted to practice in the U.S. District Court for the Western District of Tennessee, the U.S. District Court for the Middle District of Tennessee, the U.S. District Court for the Eastern District of Tennessee, the Sixth Circuit Court of Appeals, and the United States Supreme Court. Plaintiff served as the City Attorney for the City of Millersville, Tennessee beginning on or about January 24, 2024. He is a citizen and resident of Cheatham County, Tennessee, which is located in the Middle District.

2. Defendant City of Millersville is a municipal corporation organized under the laws of the State of Tennessee, located in Robertson and Sumner Counties, and is a "person" within the meaning of 42 U.S.C. § 1983. The City is responsible for the actions, policies, customs, and practices of its elected officials, appointed administrators, and law enforcement personnel. At all relevant times, the City of Millersville acted through its agents and final policymakers, including members of its Board of Commissioners, City Manager, and Chief of Police, and is liable for constitutional violations under the doctrine established in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City may be served with process through its City Attorney or City Recorder at 1246 Louisville Highway, Millersville, Tennessee 37072.

3. Defendant Scripps Media, Inc., doing business as NewsChannel 5, is a Delaware company duly authorized to do business in Tennessee. Scripps Media, Inc. owns and operates NewsChannel 5 (WTVF) in Nashville, Tennessee, located at 474 James Robertson Parkway, Nashville, Tennessee 37219. WTVF is a CBS affiliate. Scripps Media, Inc. may be served through its registered agent, Corporation Service Company located at 2908 Poston Ave, Nashville, TN 37203.

4. Defendant Phil Williams is a reporter for NewsChannel 5 and an employee of Scripps Media, Inc., whose tortious, illegal, and defamatory acts were committed within the scope of his employment and in furtherance of Scripps Media, Inc.'s business. He is a citizen and resident of Williamson County, Tennessee. Defendant Williams used his Channel 5 branded social media and his own "PhilNvestigates" social media profiles to promote, post, and republish the defamatory articles alleged herein, which is done with the knowledge, approval, and at the direction of Defendant Scripps Media, Inc

5. Defendant Levi Ismail is a reporter for NewsChannel 5 and an employee of Scripps Media, Inc. He is a citizen and resident of Davidson County, Tennessee. In addition to posting and publishing from his NewsChannel 5 credentials, he also posts on social media using various handles such as "NashvilleNews" and "@LeviIsmailTV" among others, where he posted and reposted each and every one of the false and defamatory articles identified herein.

6. Collectively, Defendants Scripps Media, Inc., Phil Williams, and Levi Ismail may be referred to herein as "The NewsChannel 5 Defendants."

7. Defendant Jesse Wayne Powell is sued in both his official capacity and his individual capacity, including for acts occurring before he was elected as a Commissioner for the City

of Millersville. He is a resident of Millersville, Tennessee and may be served at 1098 Langbrae Drive, Goodlettsville, Tennessee, 37072.

8. Defendant Dustin Darnall is sued in both his official capacity and his individual capacity, including for acts occurring before he was elected as a Commissioner for the City of Millersville, Tennessee. He is a resident of Millersville, Tennessee and may be served at 137 Brookview Circle, Goodlettsville, TN 37072.

9. Defendant David Gregory is sued in both his official capacity for acts under color of state law and in his individual capacity for unlawful acts occurring outside the scope of his official duties as a Commissioner for the City of Millersville, Tennessee. He is a resident of Millersville and may be served at 1069 Ridgecrest Drive, Goodlettsville, TN 37072.

10. Defendant Cristina Rosado a/k/a Cristina Templet is sued in both her official capacity and her individual capacity for unlawful acts occurring outside the scope of her official duties as a Commissioner for the City of Millersville, Tennessee. She is a resident of Millersville, Tennessee and may be served at 7605 Darby Road, Goodlettsville, TN 37072.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction because the Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983 and a federal question is therefore presented under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1667.

12. Venue is in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

# ALLEGATIONS OF FACT

***Background of Issues in Millersville, Tennessee and 2024 Changes in Leadership.***

13. Historically, Millersville's proximity to the Kentucky border and major highways made it a hub for illegal trafficking. Many of the "old-timers" around the City might regale about stories of moonshiners using the City as a distribution hub, and how certain now-closed businesses had been used as fronts for money-laundering. The City of Millersville was incorporated in 1981. Through years of incompetence, corruption, and mismanagement, the City's financial resources have been stressed to the limits. Incompetent management prior to January 2024 lead to the failure of the City to apply for grants for funds that were sorely needed. Poor leadership resulted in such a high number of lawsuits from 2022-2023 that it caused the City to lose its insurance with Public Entity Partners, the main insurer of municipalities in Tennessee.

14. Mayor Long and Vice Mayor Dorris opposed various corrupt practices that had been occurring in the City from 2020 to 2023, including the use of Millersville as a hub for hiring "reserve officers" so they could obtain police commission cards and direct traffic for a private security company, Solaren Risk Management. This opposition angered Commissioners Templet, who was friends with the owner of Solaren and the police chief at the time. Long and Dorris's opposition also angered Commissioner Gregory, who was found later to have possessed one of the illegal police commission cards that had been issued to him by the former Chief, Dustin Carr.

15. Mayor Long had first ran for commissioner in 2020 to fill a two year, unexpired term. He ran again in November of 2022 for a four year term, receiving 46% of the votes and becoming the City's next Mayor. In December of 2022, he heard a rumor that Cristina

Templet did not live in the City of Millersville when she ran for City Commissioner, which is illegal.

16. Mayor Long began uncovering extensive irregularities in the background and conduct of Millersville City Commissioner Cristina Templet (also known in public records as Cristina Rosado-Giles, Cristina Rosado-Brown, Cristina Spear, and similar variants), including apparent violations of Tennessee election law and municipal ethics requirements. An open-source intelligence report compiled from state licensing databases, property records, corporate filings, election commission documents, and social-media posts shows that Templet and her husband, Winston Templet, control a web of entities—including Louisville Properties LLC, StaPro Investments LLC, Hedgehog Investments LLC, and Whispering Hope Foundation—many of which share the same Sumner County addresses Templet used for voter registration and candidacy filings.

17. Public records reflect that on January 18, 2018, Templet registered to vote in Sumner County using 7711 Ruby Lane, Goodlettsville, Tennessee 37072 as her residence. At that time, however, 7711 Ruby Lane was bare land owned by Louisville Properties LLC; a residential building permit for a dwelling at that parcel (Permit No. 17302) was not issued until June 1, 2020, with only the footings inspection completed on July 10, 2020 and no certificate of occupancy issued until March 12, 2021. The same report shows that from June 2014 through May 2018 Templet was still associated with other residential addresses in Carthage (Smith County) and Hendersonville (Sumner County), rather than 7711 Ruby Lane. These records support a reasonable inference that Templet knowingly registered to vote at an address where she did not then reside, in apparent violation of Tenn. Code Ann. § 2-19-107.

18. On or about August 14, 2020, Templet completed, and on August 20, 2020 filed, a State of Tennessee Candidate Nominating Petition for Municipal Candidate listing 7711 Ruby Lane as her qualifying residence for the office of Millersville City Commissioner. That state form expressly warns that providing false information on a candidacy document constitutes a Class D felony under Tenn. Code Ann. § 2-19-109 and is punishable as perjury. Nevertheless, at the time Templet swore to that petition, the structure at 7711 Ruby Lane was still under construction, with only footings, framing, and insulation inspections recorded in July–September 2020 and no temporary final inspection until February 26, 2021. Templet thereafter repeated the same address on her October 25, 2020 Campaign Financial Disclosure Statement and then took the oath of office as Commissioner on November 24, 2020, again implicitly affirming that she met all residency qualifications. Taken together, these actions constitute multiple false statements on election documents and under oath, implicating Tenn. Code Ann. §§ 2-19-105, 2-19-109 and 39-16-702.

19. In a Facebook exchange captured in the report, Templet attempted to justify her claimed residency at 7711 Ruby Lane by asserting that she had been "living in a trailer" on the property and had received permission from the Sumner County Election Commission and the City of Millersville attorney to qualify using that address, despite the absence of any permitted dwelling. At the same time, an email from Sumner County Commissioner Jeremy Mansfield to Millersville Commissioner Milton Dorris dated February 28, 2022 confirms that, as of January 5, 2022, Winston Templet was not registered to vote in District 16, only changed his registration on January 18, 2022, and that the County Assessor "didn't even know there was a house" at 7711 Ruby Lane because no residential improvements had been placed on the tax rolls. If Templet's claim of special "permission" from election

officials were true, those approvals would themselves constitute official misconduct; if false, her statements show a willingness to fabricate official authorization to excuse clear residency violations. Either way, the episode underscores the systemic disregard for basic election safeguards that Plaintiff's administration was attempting to correct.

20. The OSINT report further documents that Templet repeatedly failed to make complete and truthful financial disclosures concerning her business interests. Her Statement of Disclosure of Interests filed with the Tennessee Ethics Commission omits entities such as Whispering Hope Foundation, HelloFilters, Inc., and other closely held businesses tied to her and her husband. At the same time, public records link Templet to a series of real-estate, rental, and investment entities—including StaPro Investments LLC and Hedgehog Investments LLC—operating from addresses in Millersville and Goodlettsville which she also used in her voter and candidate filings. These omissions, made in sworn ethics disclosures, constitute additional instances of false swearing and nondisclosure concerning financial interests that bear directly on her duties as a public official.

21. After Templet took office on November 24, 2020, she participated in and voted on a lucrative land deal in which she and her husband had a direct financial interest. Meeting minutes show that on April 5, 2021, the Millersville Board of Commissioners held a work session to discuss City-owned property at the intersection of U.S. Highway 31W and Bethel Road; on September 21, 2021, the Board considered two competing proposals concerning that parcel: (a) a letter of intent and offer to purchase from StaPro Investments LLC, and (b) a proposed listing agreement with a third-party brokerage, Southeastern Commercial Properties. On November 16, 2021, the Board voted to approve a land purchase agreement with StaPro Investments LLC; Templet voted "yea," even though StaPro had been formed

in 2016 and was owned and controlled by Winston and Cristina Templet, with Templet serving as an affiliate broker under StaPro's real-estate license. By using her public office to advance and vote for the sale of City property to an entity she and her spouse owned, and from which she stood to benefit, Templet engaged in classic self-dealing of the kind criminalized as "official misconduct" under Tenn. Code Ann. § 39-16-402.

22. With the assistance of former City Manager Scott Avery, the Templets took action to conceal their involvement in various projects in the City, including Winston Templet using fictitious names like "Jones Property Town Homes" or having former Scott Avery list only the tax and parcel numbers in City meeting agendas instead of listing the address and the owner/developer information in order to conceal the true owners of the property.

23. Based on the synthesis of property records, election documents, ethics filings, and meeting minutes, the OSINT report concludes that Templet's conduct appears to constitute at least three separate Class D felonies and seven Class A misdemeanors under Tennessee election-law and perjury statutes, in addition to multiple acts of official misconduct arising from the StaPro land transaction. The report also notes that this evidence was presented to District Attorney Ray Whitley on at least three occasions, yet no investigation was opened and no evidence was ever submitted to the Sumner County Grand Jury. Instead, the responsible prosecutorial and election authorities declined to enforce plainly applicable criminal statutes, effectively protecting Templet from accountability for conduct that would have resulted in immediate prosecution if committed by an ordinary citizen.

24. Plaintiff's administration was directly involved in uncovering, documenting, and challenging these violations as part of its effort to restore lawful governance and basic integrity to the City of Millersville. Mayor Long and other reform-minded officials and

citizens raised these concerns in public meetings, compiled and circulated the OSINT report with supporting public records, and formally requested that state and county officials—including District Attorney Whitley and Sumner County Administrator of Elections Lori Atchley—initiate appropriate criminal and administrative investigations into Templet's conduct. Those requests were ignored or rebuffed.

25. The retaliatory actions described elsewhere in this Complaint occurred only after Plaintiff and his administration insisted that the law be applied equally to Templet and that the City cease doing business on the basis of sham residency claims and insider land deals that enriched sitting officials at the public's expense.

26. Mayor Long removed Winston Templet from the Planning Commission due to a conflict of interest with him voting to approve projects where he and his wife held an undisclosed, material interest, and the Templets retaliated by forming another shell company they named "FU Tommy Long, LLC," spray-painting the name on a dumpster and moving it around town until they eventually parked it next to Mayor Long's home.

    a. See https://www.wsmv.com/2023/09/06/husband-political-rival-millersville-mayor-tommy-long-registers-company-with-state-named-fu-tommy-long-llc/ (Sept. 6, 2023).

    b. Winston Templet frequently discussed his vendetta against Mayor Long in his many YouTube Videos:



27. From 2019 to 2023, the City faced longstanding problems, including a quid pro quo scheme with Solaren Risk Management—a security firm owned by Jack Byrd III. Uncertified officers received Police Commission Cards, allowing them to direct traffic and work lucrative downtown Nashville security gigs, despite lacking the required Tennessee POST certification. Media outlets ran multiple stories alleging unlicensed guards and impersonation of police officers.

    a. https://www.tennessean.com/story/news/2017/08/10/nashville-metro-council-candidate-runs-office-while-fighting-extortion-charges-giles-county/548537001/ (Aug. 10, 2017);

    b. https://www.wsmv.com/2023/05/04/security-company-insiders-imposter-police-officers-all-worked-same-business/ (May 3, 2023);

    c. https://www.newschannel5.com/news/newschannel-5-investigates/security-company-vows-to-make-changes-following-allegations-of-hiring-unlicensed-guards (May 26, 2023);

    d. https://www.wsmv.com/2024/07/02/state-issues-62-violations-against-company-accused-allowing-imposter-cops-nashville-streets/ (July 2, 2024);

    e. https://tennesseeconservativenews.com/davidson-county-sheriffs-office-investigating-fake-cops-in-nashville/ (Sept. 23, 2024);

    f. https://www.newschannel5.com/news/newschannel-5-investigates/sheriff-suspends-four-deputies-for-wearing-misleading-police-patch-while-working-off-duty-private-security (Oct. 11, 2024);

28. Former Chief Dustin Carr was often in the news, with allegations of an illegal quid pro quo for the sale or barter of police commission cards for up to $5,000 a piece. At least one

eyewitness claimed in an online podcast to have seen that Carr had a drawer that was filled with bundles of cash that vastly exceeded his police chief salary. Carr abruptly resigned on December 12, 2022 shortly before photos he had taken of himself brandishing his penis at City Hall while in his police uniform emerged online.

   a. https://www.wsmv.com/2023/07/07/recorded-phone-call-former-police-chief-raises-questions-quid-pro-quo-commission-card/ (July 7, 2023);
   b. https://www.newschannel5.com/news/newschannel-5-investigates/millersville-police-chief-named-in-bullying-lawsuit-resigns (Dec. 12, 2022).
   c. https://mainstreetmediatn.com/articles/news-robertsoncountyconnection/millersville-police-chief-abruptly-resigns-before-emergence-of-indecent-photograph-2/ (Dec. 27, 2022).

29. Throughout 2023, the City of Millersville faced ongoing issues at the Police Department. Former Assistant Police Chief Glenn Alred—lacking a current P.O.S.T. certification—served full-time when he could only lawfully be employed as a "part-time reserve officer," violating P.O.S.T. rules and subjecting the City to potential criminal sanctions. He and Interim Police Chief Melvin Brown resigned in July 2023, sparking additional media coverage of their actions:

   a. https://www.newschannel5.com/news/newschannel-5-investigates/millersville-cop-under-investigation-amid-questions-about-his-state-certification (Mar 9, 2023);
   b. https://www.wsmv.com/2023/09/26/internal-investigation-former-assistant-chief-violated-deadly-force-restriction-policy/ (Sept. 25, 2023).
   c. https://www.newschannel5.com/news/newschannel-5-investigates/state-investigators-confirm-timesheet-issues-for-now-former-millersville-assistant-police-chief (Aug. 18, 2023).

30. In November 2023, then–City Manager Scott Avery hired Robert "Uno" Richman from Texas as Millersville's new police chief, despite Richman's lack of a college degree and a controversial record as Associate Commissioner for Child Protective Investigations in Texas, which included allegations (reported by the Texas Tribune) of mishandling sex

trafficking and abuse reports at a foster care facility resulting in the Governor of Texas demanding that Richman step down from office.

    a.  https://www.texastribune.org/2022/08/12/texas-child-abuse-agency-rich-richman/ (Aug. 12, 2022).

31. In exchange for hiring Richman, Richman placed Scott Avery on the Millersville "Reserve Officer" list despite him lacking the required P.O.S.T. certification and mandatory training hours. The illegal reserve commission nonetheless gave Avery cover to work one of the lucrative security contracts for Jack Byrd and Solaren Risk Management in Downtown Nashville.

32. Around January 26, 2024, Interim City Manager Tina Tobin terminated Richman after he presented a roster listing former City Manager Scott Avery as a "reserve officer." Records online also revealed that Richman faced harassment and criminal trespass charges in Texas for conduct presumed to have occurred before he had relocated to Tennessee:



The State of Texas vs. Robert Richman

| | |
|---|---|
| Defendant | Richman, Robert J<br>555 Pump Station RD<br>Wimberley, TX 78676 |
| State | The State of Texas<br>712 S Stagecoach TRL<br>San Marcos, TX 78666 |

Charges: Richman, Robert J
1.    HARASSMENT
2.    CRIMINAL TRESPASS

| OTHER EVENTS AND HEARINGS | | |
|---|---|---|
| 03/13/2024 | Magistration Documents | |
| 03/13/2024 | Complaint & Information (Open Case) | |
| 03/13/2024 | Order for Summons (Judicial Officer: Brown, Elaine ) | |
| 03/13/2024 | Summons | |
| | Richman, Robert J | Returned Unserved 03/20/2024 |
| | | Returned 03/20/2024 |
| 03/20/2024 | Summons Return | |
| 04/24/2024 | Arraignment (9:00 AM) (Judicial Officer Johnson, Chris) | |
| | NO ARREST / NO WARRANT | |
| | Result: Failure To Appear | |
| 05/22/2024 | Order for Summons (Judicial Officer: Brown, Elaine ) | |
| 05/22/2024 | Summons | |
| | Richman, Robert J | Returned Unserved 05/28/2024 |
| | | Returned 05/28/2024 |
| 05/28/2024 | Summons Return | |
| 07/03/2024 | Arraignment (9:00 AM) (Judicial Officer Johnson, Chris) | |
| | NO ARREST / NO WARRANT | |

33. Before the January–February 2024 personnel changes in Millersville, the City had only one detective with under a year of experience, and he had been "*Giglio*-impaired"[1] by the Robertson County DA for lying about involvement in a traffic stop of a meth trafficker, Savannah Hill. A *Giglio*-impaired officer is when prosecutors refuse to call a witness due to documented untruthfulness, often leading to case dismissals. Former Assistant Chief Glen Alred—friend and business associate of former Millersville Police Chief Dustin Carr—was also *Giglio*-impaired by the same DA for lying about his role in that same traffic stop.

***Plaintiff Begins Working for a New Administration Under Interim City Manager Tina Tobin.***

34. In January 2024, the City of Millersville saw key leadership changes. Commissioner Alisa Huling won a special election over former Mayor Tim Lassiter, ending a 2–2 deadlock on

---

[1] See *Giglio v. U.S.,* 405 U.S. 150 (1972), a case in which the prosecution failed to disclose a promise of immunity to a state's witness. In Tennessee law enforcement circles, a "*Giglio*-impairment" refers to a prosecutor's duty to provide exculpatory evidence that impeaches the testimony and credibility of the police officer, and is part of the *Brady v. Maryland,* 373 U.S. 83 (1963) line of cases. If the exculpatory evidence is that the officer had lied to prosecutors, for example, it could result in a refusal to prosecute the officer's cases. In that regard, a *Giglio*-impairment amounts to a "scarlet letter" for law enforcement officers.

the Board of Commissioners—split between Commissioners Cristina Templet and David Gregory versus Mayor Tommy Long and Vice Mayor Milton Dorris.

35. On or about January 23, 2024, the Alisa Huling was sworn in as Commissioner for the City of Millersville and began her tenure as a government official. The order of business included a discussion about the employment of Scott Avery, which had been published in the agenda at least 48 hours in advance of the meeting. Avery was, not surprisingly, terminated by a vote of 3-2, with Alisa Huling, Tommy Long, and Milton Dorris voting to terminate him.

36. Avery had previously been fired from another city manager post and faced multiple controversies during his year in office. After one year, he was an at-will employee and his termination was expected. In the days leading up to the vote, Avery deleted around 30,000 emails and texts, forwarded city emails to his personal account. Because he knew he was going to be voted out as City Manager, he removed several boxes of documents from City Hall the day before the city meeting, which was captured on CCTV.

37. Tina Tobin was then voted in as Interim City Manager in a 3-2 vote. The City Attorney at the time, Jack Freedle, was overheard stating, in words or substance, that he had been retained by Winston Templet and he mentioned some sort of ethics investigation. As promised, Freedle filed a lawsuit for alleged violations of the Open Meetings Act on behalf of Winston Templet three days later against Long, Dorris and Huling. The lawsuit was frivolous on its face, as Commissioner Huling could not be considered a public official until she was sworn in as Commissioner, and it was impossible for her to have deliberated with Tommy Long and Milton Dorris outside the sunshine prior to the anticipated vote to terminate Scott Avery as City Manager.

38. On or about January 24, 2024, Tina Tobin asked Jack Freedle what cases he was working on via an email, and Freedle responded by threatening to sue her if she terminated anybody, which was solely her power under the Millersville Charter.  Freedle's attempt to extort the Interim City Manager and intimidate her from fulfilling her duties failed, and he was terminated.  These changes lead to immediate retaliation from Cristina Templet and David Gregory and resulted in their year-long campaign to obstruct and interfere with municipal operations.

39. On January 24, 2024, Ms. Tobin contacted Plaintiff and asked him to come to City Hall to discuss issues occurring at Millersville and to discuss the City Attorney position.  Under the City Charter, the City Manager had the sole discretion to hire and fire  the City Attorney, and it did not involve the vote of the of the Board of Commissioners.   The Board only had the power to set the salary or hourly rate of the City Attorney, which it had already done years prior.

40. Plaintiff had filed suits against the City of Millersville several times during his career, but he had no active, pending cases against the City or any of its employees.  He had not even deposed anybody that was still employed at the City.  Plaintiff researched every informal opinion published by the Board of Professional Responsibility involving conflicts of interest issues for city attorneys, preparing a memorandum for Tina Tobin showing that he did not have an actual conflict of interest.  Mrs. Tobin offered the position of City Attorney to Kroll with an almost identical contract as former City Attorney Jack Freedle's and at the same rate, which had previously been voted on and approved by the Board.

41. Plaintiff had a great  deal  of  litigation  experience  against  municipalities,  including employment cases, civil rights cases, cases involving regulatory issues, Open Meetings Act

cases, Public Records Act cases, and wage and hour cases, among others. His expertise in these areas made him an ideal candidate. He also had many clients who were police officers from referrals through the Southern States Police Benevolent Association, and was aware of issues at Millersville because of his involvement in representing several officers against the City of Millersville years before.

42. After speaking with Tina Tobin about the job and her desire to clean up the corruption in Millersville, Plaintiff agreed to take the position. Plaintiff was attracted to the challenge of providing live legal advice to the Board during their televised meetings, and also wanted to ensure that the City stopped getting sued so often for decisions that could have been avoided with proper legal advice. The position was originally supposed to be part-time. All prior City Attorneys also maintained a private practice in addition to the role of City Attorney. There were monthly regular meetings and monthly work sessions that the City Attorney would attend, if requested. The work of the City Attorney was directed and approved by the City Manager. If any conflicts of interest arose, Plaintiff agreed to obtain outside counsel, as all other City Attorneys had done before him.

43. Under the City Charter, the City Manager had sole authority to make hiring and firing decisions. She lawfully exercised that authority to terminate the nascent police chief, Rob Richman, after he presented her with a roster showing that he had employed former City Manager Scott Avery as a "reserve officer," even though he lacked the proper credentials and P.O.S.T. certifications to do so and had been terminated as City Manager. Tobin had also been advised about the pending criminal charges against Mr. Richman in Texas.

44. There were numerous resumes for the police chief position that had been submitted along with Rob Richman's. One of those resumes was for Bryan Morris, whom Tina Tobin felt

was the most qualified based on his knowledge, skills, and expertise as the former Ridgetop Police Chief.

45. The City of Ridgetop had disbanded its police department in July of 2019 in retaliation for Bryan Morris and Shawn Taylor blowing the whistle on an illegal ticket quota implemented by the Ridgetop Board of Mayor and Aldermen.  Plaintiff Kroll represented Morris and Taylor in that lawsuit, along with the other Ridgetop PD officers who lost their jobs by virtue of the disbandment.  Kroll had researched whether any conflict of interest would arise if he worked as City Attorney while Bryan Morris was Police Chief would create a conflict of interest and found no ethics opinion that even remotely suggested it would do so.  Discovery had closed and that case was waiting on a decision on summary judgment. No witnesses overlapped and the case was totally unrelated to anything involving Millersville.

46. In February of 2024, Tina Tobin fired Fire Chief Brandon Head.  She had asked Mr. Head about his involvement in printing the illegal police commission cards for uncertified "reserve officers," which he denied.  However, the ID Printer that was used to print the illegal cards was in his office, and emails showed him agreeing to print commission cards for the police department.

47. Despite the Defendants' interference with the City of Millersville, services inside the City of Millersville immediately began to improve with the new administration.   Before the 2024 leadership shift, a local trailer park saw an alarming rate of one to two dead bodies appearing weekly from what appeared to be drug overdoses, earning it the grim nickname "the body park" among Millersville officials.  Prior administrations had either ignored the

problem or failed to competently address it. Under the leadership and experience of Chief Morris, however, dead bodies suddenly stopped surfacing in Millersville almost overnight.

48. Chief Morris learned that the police department was understaffed, and he began hiring qualified officers via delegated authority from the interim City Manager. One of the officers he hired to assist in rebuilding the police department was Shawn Taylor, who was brought in as Assistant Chief.

49. Chief Bryan Morris, Assistant Chief Shawn Taylor, Captain Todd Dorris, and Detective Michael Candler were POST-certified career officers with more than fifty years of combined experience. They were hired to replace Millersville's prior regime of uncertified "reserve" officers tied to Solaren Risk Management and to rebuild the department around lawful, professional policing. Using his prior experience and training, Assistant Chief Taylor began modernizing MPD's investigative capabilities and providing intelligence support to Capt. Dorris and Det. Candler on the corruption and financial-crime matters described in this Complaint.

50. In early 2024, Assistant Chief Taylor audited MPD and City records and uncovered missing personnel files, incomplete or improper background checks, and apparent irregularities in the use of law-enforcement databases by former Millersville officials and Solaren-affiliated personnel. To correct and investigate these issues, he contacted FinCEN to secure access for MPD; consulted with TBI officials regarding proper use and re-dissemination of Suspicious Activity Reports; requested background-check and CAD data from the Sumner County Emergency Communications Center; and met with representatives of TDCI, the POST Commission, and other state agencies about Millersville's prior practice of issuing illegal commission cards and its lack of training and

personal records. Taylor followed up by offering written intelligence reports and continued cooperation to these regulators.

51. Taylor also reported suspected misuse and security breaches involving the Tennessee Integrated Criminal Justice Portal by former Millersville employees, requested that ICJP administrators investigate anomalies he had identified, and worked with them to restore MPD's proper authorization and compliance with CJIS/TIES requirements. MPD's limited use of CAD entries for these sensitive corruption and financial-crime matters was an intentional operational-security measure designed to avoid alerting targets of ongoing investigations, not a violation of any law or policy.

52. By mid-March 2024, Assistant Chief Taylor was actively coordinating a multi-agency response to the misconduct he had uncovered. On March 15, 2024, he met with officials from the Tennessee Administrative Office of the Courts (AOC) about suspected misuse of the Criminal Justice Portal by former Millersville employees, proposed formation of a public-corruption task force, and formally advised them that MPD had opened a criminal investigation into several former City employees. Over the next several days, Taylor worked with AOC personnel on a TNCRIM audit request and asked whether uncertified officers' access to the portal constituted criminal violations. At the same time, TBI Intelligence Analyst Brooklyn Nash followed up with Taylor regarding his FinCEN requests—signaling that TBI was tracking and supporting his efforts—and Taylor confirmed he was preparing precise, well-supported FinCEN inquiries.

53. On March 26, 2024, Taylor informed the AOC that he had developed probable cause to seek a search warrant for at least one suspect and intended to continue building cases against all involved. He explained that the Tennessee Department of Commerce and

Insurance was conducting a parallel investigation and proposed a formal, multi-agency task force to pool evidence and coordinate enforcement. On April 2, 2024, AOC representative Charisse Bonwell responded on behalf of her agency and in coordination with TBI personnel, expressly agreeing to assist and stating, "We will assist you in any way that we can." At no point did any state or federal official suggest that Taylor's conduct was improper; instead, their emails reflect confidence in his competence, diligence, and adherence to protocol as he used properly assigned case numbers and inter-agency cooperation to uncover extensive criminal activity in and beyond Millersville.

54. On April 2, 2024, former Millersville Police Chief Dustin Carr was apprehended in Goodlettsville during what appears to have been a theft sting operation. Officers located more than $100,000 in stolen merchandise in Carr's possession while he was driving a Solaren Risk Management vehicle, and the incident was documented in CAD and in Gallatin PD incident report 24-00691. The report reflects that Carr represented himself on Facebook marketplace to the theft victims "as a police officer" and arranged a meet up at QuikTrip gas station to sell the stolen items. Yet, despite the seriousness of the conduct—large-scale theft and impersonation of an officer—Carr was never charged or prosecuted. This starkly selective non-enforcement further undermines the credibility of the "official misconduct" and "perjury" allegations later brought against Assistant Chief Taylor for merely investigating public corruption and criminal activity.

55. Even as these events unfolded, Chief Morris and Assistant Chief Taylor continued expanding MPD's capabilities and deepening inter-agency cooperation. On April 3, 2024, Chief Morris forwarded Taylor correspondence from the Blue Lightning Operation Center (BLOC), an ICE/HSI initiative targeting human trafficking and commercial sexual

exploitation, so that other MPD officers could model Taylor's already-existing BLOC access and his status as a HIDTA agent. On April 4, 2024, Taylor updated TDCI regarding his investigation of a former MPD officer who had unlawfully used the Criminal Justice Portal to run personal background checks, and he requested relevant files to support potential charges. That same day, District Attorney General Ray Whitley unilaterally closed his investigation into Commissioner Cristina Templet, asserting there was "no evidence" warranting prosecution—again illustrating the stark contrast between the treatment of politically connected officials and the retaliation directed at Taylor for pursuing honest, uncompromised law enforcement.

56. On April 23, 2024, Assistant Chief Taylor formally launched "Operation Clean Sweep," a targeted anti-corruption initiative. That same day, former Mayor Tim Lassiter was arrested on two counts of document fraud/criminal simulation arising from his role in issuing himself unauthorized building permits and pushing through an unapproved renovation of sleeping quarters at the Millersville Fire Hall. The build-out—which ignored applicable fire codes—left the facility unusable for its intended purpose and wasted more than $100,000 in taxpayer funds. Lassiter was also believed to have been involved in a similar, improper build-out of the City's already deficient evidence room.

57. The following day, April 24, 2024, NewsChannel 5 reported that District Attorney General Ray Whitley publicly criticized MPD for not consulting him before Lassiter's arrest and openly questioned whether he would prosecute—all before reviewing the evidence. Commissioner Cristina Templet appeared outside the jail with Lassiter's family, characterizing the arrest as a personal vendetta by Mayor Tommy Long and praising Lassiter as an "amazing human being," despite the documented irregularities.

58. Meanwhile, between May 3 and May 7, 2024, TBI officials emailed Assistant Chief Taylor multiple positive Suspicious Activity Reports (SARs) and Currency Transaction Reports (CTRs) from FinCEN regarding individuals and entities under MPD investigation. These federal hits confirmed that independent financial institutions and FinCEN had flagged numerous transactions as suspicious, corroborating Taylor's anti-corruption and financial-crime investigations and reinforcing that Operation Clean Sweep was rooted in legitimate law-enforcement concerns, not personal or political animus.

*Plaintiff's Public-Interest Reform Work In Millersville*

59. When Plaintiff took office as City Attorney, Millersville faced chronic water-pressure problems that affected fire protection, daily household needs, and the City's ability to grow safely. Existing infrastructure was inadequate to meet peak demand for firefighting and residential use.

60. Plaintiff began researching, identifying, and pursuing state and federal grant programs that could fund a much-needed municipal water tower to stabilize water pressure, improve fire flows, and protect residents and property throughout the City.

61. Plaintiff also discovered that the prior administration had failed to apply for or utilize millions of dollars in grant funding available for the City's fire department, despite the department's documented need for upgraded equipment and facilities to protect the public.

62. The deadline for that fire-department grant opportunity expired mere weeks before Plaintiff took office, causing an avoidable loss of significant funding that could have improved emergency response and public safety for Millersville residents.

63. In response, Plaintiff made it a priority to ensure that Millersville did not miss additional funding opportunities, and he actively worked with staff and outside resources to identify

new grants and funding streams for critical infrastructure and public-safety projects, including the water system and the fire department.

64. Plaintiff likewise began exploring grants and other funding mechanisms for parks, recreation, and green space, recognizing that Millersville had long neglected these community assets and that improved parks would provide safe, healthy spaces for children and families and help reduce crime.

65. One focus of Plaintiff's reform efforts was a blighted and illegal trailer park within the City limits that had become a notorious haven for drug activity, violent crimes, and code violations, posing ongoing danger to nearby residents and draining police and emergency resources.

66. Plaintiff used available enforcement tools, including zoning, code enforcement, and nuisance abatement powers, to shut down the illegal trailer park and bring the property into compliance with law.

67. Plaintiff then worked with City leadership to initiate an eminent domain process to acquire the former trailer park property for a legitimate public use: the creation of new soccer and baseball fields that would replace a hotspot of crime and blight with safe recreational facilities for families and children.

68. These actions transformed a dangerous and illegal operation into a public amenity, directly advancing public safety, community health, and lawful land use, and exemplifying Plaintiff's commitment to using his office to protect and improve the lives of Millersville residents.

69. After Plaintiff took office, residents began coming to City Hall specifically to meet with him. Long-time citizens told Plaintiff that this was the first time in the 30 years they had

lived in Millersville that they felt comfortable speaking to anyone in City government, much less a City Attorney, without fear of retaliation.

70. Many of these citizens met with Plaintiff to report and seek help correcting illegal land deals, unlawful operations and businesses, unpermitted developments, and other longstanding abuses that previous administrations had ignored or facilitated.

71. Plaintiff welcomed these residents, took their concerns seriously, and used his position to investigate, address, and, where appropriate, initiate enforcement actions to remedy illegal arrangements and bring powerful actors into compliance with the law.

72. Through these efforts, Plaintiff's work and advocacy focused on core matters of public concern—including infrastructure, public safety, elimination of blight, environmental stewardship, lawful land use, and governmental transparency—and stood in direct contrast to the prior administration's neglect of grant opportunities, failure to enforce the law, and tolerance for unlawful operations within the City.

***Coordinated Lawfare: Darnall, Templet, Powell, and Phil Williams Conspire to Disrupt City Operations and Weaponize Serial, Baseless BPR Complaints***

73. While Chief Morris and Assistant Chief Taylor were rebuilding the Millersville Police Department, forming a multi-agency public-corruption task force, and expanding the City's capacity to investigate financial crimes and online child exploitation, Plaintiff was simultaneously working, in his role as City Attorney, to stabilize municipal operations, defend the City in pending matters, and implement long-overdue legal and policy reforms. These combined efforts directly threatened the interests of the prior regime and those politically aligned with it. Rather than support or even objectively evaluate these reforms, Defendants Dustin Darnall, Cristina Templet, Jesse Powell, and their media ally Phil

Williams embarked on a parallel campaign to undermine Plaintiff and the new administration—misusing the Board of Professional Responsibility process, orchestrating frivolous complaints, and generating sensational news coverage designed to discredit Plaintiff and sabotage the City's anti-corruption work.

74. Beginning in January 2024, Defendant Dustin Darnall, acting in concert with former Commissioner Cristina Templet, former City Attorney Jack Freedle, political ally David Gregory, and NewsChannel 5 reporter Phil Williams, weaponized the Tennessee Board of Professional Responsibility ("BPR") process against Plaintiff in order to obstruct his work as Millersville's City Attorney and to restore the prior corrupt administration to power. Each time Plaintiff refuted Darnall's accusations, Darnall simply shifted theories, solicited new talking points from Templet and Freedle, and funneled his allegations and Plaintiff's responses to Williams to fuel a coordinated media and political smear campaign—not out of any genuine concern about ethics, but to remove Plaintiff and dismantle the reform administration he served.

75. On January 27, 2024, Darnall posted in the "Millersville Community Education" Facebook group, a private, invitation-only page controlled by Defendant Templet, touting himself as a "whistleblower" and claiming that he had "invoked whistleblower protection" and been fired a few hours later by Interim City Manager Tina Tobin on Tobin's first day. Upon information and belief, Darnall could only have known the contents and timing of these internal communications because Freedle, who had been asked by Tobin to identify the matters the City Attorney was working on, secretly provided Darnall with Plaintiff's responsive email. In the same post, Darnall actively encouraged citizens to file BPR complaints against Plaintiff based on the false assertion that Plaintiff was simultaneously

representing plaintiffs against the City while serving as City Attorney, and he announced that he was "organizing a group to push back" against Plaintiff's administration—explicitly using the BPR complaint process as a political weapon.

76. On February 1, 2024, Darnall filed his initial BPR complaint ("BPR Complaint") falsely alleging that Plaintiff had an active lawsuit against the City of Millersville while serving as City Attorney. In that filing, Darnall cited and attached communications he had received directly from Templet, who was actively disseminating false information about Plaintiff's appointment and misrepresenting the nature and status of Plaintiff's prior cases against the City, which had already been resolved or were no longer pending. Templet also falsely claimed in text messages that the Board of Commissioners was required to vote on Plaintiff's appointment as City Attorney, even though no such vote was required. These coordinated misstatements furthered Templet's and her husband's ongoing scheme to disrupt city government, delegitimize the current administration, and create political cover for their return to power.

77. On February 22, 2024, Darnall filed a "supplement" asserting that Plaintiff had a "conflict of interest" under ABA Model Rule 1.7(b)(4). The citation to that particular rule, and the framing of the claim, mirror former City Attorney and Templet attorney Jack Freedle's talking points. The allegation was objectively false: Darnall's own attachments showed he had reviewed Plaintiff's publicly available cases and knew that the Black/Barnes lawsuit against Millersville, filed in 2021, had long since been resolved, and that Plaintiff had no active litigation against the City.

78. On April 8, 2024, undeterred, Darnall submitted yet another BPR complaint, now accusing Plaintiff of "illegally stonewalling" his open-records requests. This accusation again had

nothing to do with professional ethics. Darnall was demanding emails from private businesses and personal accounts belonging to individuals who were not City officials; Plaintiff and the City produced the records that actually existed, and could not produce documents that did not. In that filing, Darnall cryptically referenced "3 of us in Millersville" pursuing these requests, a reference, to himself, Jesse Powell, and Templet—further evidence of a coordinated, abusive lawfare strategy rather than a genuine quest for transparency.

79. On April 15, 2024, Darnall emailed Plaintiff about one such public-records request that had been denied, bragging that he already possessed emails that would have been responsive—thus confirming that his voluminous requests were designed to burden the City and manufacture pretexts for additional complaints, not to obtain information he actually lacked. Together, these repeated, shifting, and baseless BPR filings, synchronized with litigation filed by the Templets and Channel 5's media attacks, demonstrate an ongoing agreement among Darnall, Templet, Gregory, Powell, and Williams to misuse regulatory processes and public narratives to interfere with Plaintiff's law practice and to sabotage the reform administration he served.

80. Between January and June 2024, Defendant Darnall submitted at least six separate complaints or supplemental filings to the BPR. Each time one set of allegations was disproven, Darnall promptly pivoted to a new theory within days or weeks, often immediately after a NewsChannel 5 broadcast or a public meeting involving Templet and Freedle. This pattern reflects not a good-faith ethics concern, but a coordinated campaign to keep Plaintiff under perpetual investigation and to generate material for Phil Williams's ongoing smear coverage.

*The May 20, 2024 Smear Campaign*

81. On May 20, 2024, Phil Williams suddenly started reporting on Millersville over Levi Ismail and actively joined as participants and co-conspirators in the campaign to discredit Assistant Chief Shawn Taylor, Plaintiff, and the reform administration.

82. For more than a decade, Plaintiff had a professional relationship with Phil Williams, who was a close personal friend of Plaintiff's former law partner at the Blackburn Firm, W. Gary Blackburn. At Blackburn's direction, Plaintiff had supplied Williams with information on numerous occasions and had served as a confidential source for multiple NewsChannel 5 stories. During that time, Williams repeatedly emphasized to Plaintiff that his "number one rule" was that he would never step in to cover a story that another journalist was already working—both as an ethical boundary and to avoid the appearance of agenda-driven reporting. Against that backdrop, Williams's sudden decision in 2024 to insert himself into and effectively take over coverage of Millersville—a story that other reporters and outlets were already pursuing—was a stark and telling departure from his professed standard, strongly indicating that his involvement was not driven by neutral news judgment, but by his personal and political alignment with Blackburn, Templet, Gregory, and their allies in their campaign against Plaintiff and the reform administration.

83. Although Phil Williams was suddenly the lead journalist in the NewsChannel 5 Millersville campaign, reporter Levi Ismail actively participated in, and amplified, the defamatory campaign against Plaintiff. Ismail co-produced and promoted several of the challenged "investigative" segments, repeatedly posting and reposting Williams's stories on social media with his own approving commentary, thereby republishing and endorsing the false narratives about Plaintiff's supposed "conflicts of interest," "conspiracy theories," and

alleged ties to "far-right extremism." Ismail did so despite his personal knowledge of Plaintiff's civil-rights work—including his prior reporting on *Black et al. v. City of Millersville*—and despite having received documents and messages from Shawn Taylor in 2023 that contradicted key claims later made on air. By lending his platform, credibility, and repetition to Williams's attacks, Ismail became a direct participant in the defamation and the broader conspiracy to destroy Plaintiff's reputation and position.

84. The May 20, 2024 story[2] about Assistant Chief Taylor that falsely portrayed Williams as having "discovered" Taylor through investigative reporting. This article, and all others, were posted by Williams under the series banner "Hate Comes to Main Street," which falsely compared Plaintiff and other members of his administration to White Supremacists, KKK Members, and members of other Hate Groups.

85. In truth, Taylor himself had approached Williams in the spring of 2023 with information about public corruption, and Williams had previously used that information to ridicule Taylor on air as a "conspiracy theorist." Williams's May 20, 2024 piece thus inverted reality: instead of acknowledging Taylor as a source who had tried to report misconduct, Williams repackaged him as the target—advancing the narrative pushed by Templet, Gregory, and their allies that Taylor and the new administration were the problem rather than the corruption they were uncovering.

86. The very next day, May 21, 2024, Williams and a NewsChannel 5 camera crew appeared at the Millersville Regular Commission Meeting specifically to stage and capture coordinated attacks on Taylor and the administration. The official meeting video available at    https://play.champds.com/millersvilletn/event/98/s/2866,    shows    that

---

[2] A copy of the May 20, 2024 article and additional articles referenced herein is included in the Appendix filed herewith.

Williams's cameraman, Brian Staples, shifted his camera position in advance of citizen comments and that a Channel 5 microphone was placed on the podium before Defendant Dustin Darnall spoke, indicating that Williams had prior notice that Darnall would be addressing the story Williams had aired the day before.

87. When Darnall was called to the podium, he delivered a prepared, scripted statement referencing the May 20 broadcast, thereby turning the citizen-comment period into a made-for-TV segment that dovetailed seamlessly with Williams's narrative. https://play.champds.com/millersvilletn/event/98/s/2884.

88. Each time Darnall was the subject of a NewsChannel 5 story, he had a written, scripted statement. Based on these facts, it is reasonable to assume and Plaintiff therefore avers that Defendant Williams and NewsChannel 5 prepared the scripted statements for Darnall.

89. The same video at https://play.champds.com/millersvilletn/event/98/s/3195 further shows Commissioner David Gregory (red shirt) rising later in the meeting, announcing that he had a letter about Shawn Taylor to distribute to the commissioners and that he would read it into the record, then expressly stating, "Mr. Williams, I've got one for you," and handing Williams his own copy.



90. This on-camera exchange demonstrates that Gregory had coordinated with Williams in advance, that Williams was not a neutral observer, and that the broadcast, Darnall's scripted remarks, and Gregory's "inquisition letter" were all components of a single, orchestrated smear operation directed at Taylor, Plaintiff, and the reform administration.

91. Plaintiff will show that the "Gregory/Templet Inquisition Letter" was drafted by Commissioners David Gregory and Cristina Templet as a purported "notice of special call meeting" to question Assistant Chief Shawn Taylor's "mental competency" and prior political speech—matters over which they had no authority under the Millersville Charter. The May 21, 2024 Regular Commission Meeting video demonstrates that Phil Williams anticipated this staged attack available in the following link: https://play.champds.com/millersvilletn/event/98/s/2965.  At approximately the 49:25 mark, Williams can be seen rising from his seat, retrieving the NewsChannel 5 microphone from the podium where Dustin Darnall had just spoken, and deliberately repositioning it in front of Gregory before Gregory read his letter into the record, which proves the conspiracy between Defendants Templet, Gregory, Darnall and Williams:





92. After the same meeting, Williams personally questioned Plaintiff on camera about the pending BPR complaints, confirming that Darnall had been supplying both his complaints and Plaintiff's confidential responses directly to Williams. In a later broadcast, however, Williams falsely suggested that Plaintiff had "suddenly" disclosed those complaints, creating the misleading impression that Plaintiff had been hiding information that was, by rule, confidential—when in fact it was Darnall who was abusing the BPR process and leaking materials to Williams for use in his smear coverage.

93. On May 22, 2024, NewsChannel 5 immediately repackaged and rebroadcast the May 20 segment as a breaking "scandal," publishing Templet and Gregory's Inquisition Letter without any meaningful scrutiny despite documentary evidence that Taylor had passed all psychological and other pre-employment requirements.

94. The resulting story showcased Gregory's line crediting "what we saw on NewsChannel 5 last night," thereby closing a feedback loop in which NewsChannel 5 manufactured the premise, and Gregory and Templet then validated it on cue at a public meeting. The article referenced "questions from the public" about Williams's prior encounter with Taylor— plainly referring to Darnall's choreographed comments—but conspicuously omitted Darnall's name to conceal his coordination with the station.

95. The story further quoted Plaintiff's response on behalf of the City and Taylor, but intentionally omitted in the sound-bite that Plaintiff represented Taylor only in an unrelated lawsuit against a third party wholly unconnected to Millersville:

Bryant Kroll, the attorney for Millersville and Shawn Taylor, replied to a citizen's question.

"Sir, I can go ahead and comment about the issue of whether there were city resources used to investigate a journalist. That's absolutely untrue."

96. By suppressing this context, Williams and NewsChannel 5 created the false and defamatory impression that Plaintiff was representing Taylor *against* the City of Millersville, in order to prop up the narrative that Plaintiff labored under a disqualifying "conflict of interest" and was acting contrary to the City's interests—when, in truth, Plaintiff and the reform administration were actively combating the very corruption that Darnall, Templet, Gregory, and Williams were defending and enabling.

97. NewsChannel 5's reliance on Commissioner David Gregory's "conflict of interest" accusation was knowingly false and defamatory. The article quoted Gregory as saying that Plaintiff "sued Millersville when Taylor was previously fired from there" and that Plaintiff "now represents Taylor and the chief in their lawsuit against the town of Ridgetop," concluding, "That's a conflict of interest." In reality, the lawsuit involving Taylor and Millersville arose from Taylor's prior termination in 2017 and had been fully resolved years before Plaintiff was appointed City Attorney; there was no pending litigation between Plaintiff's clients and Millersville at any relevant time. Plaintiff's representation of Taylor and Chief Morris in a separate lawsuit against the Town of Ridgetop—an entirely different municipality—likewise created no conflict with Millersville's interests.

98. When Phil Williams questioned Plaintiff at the May 21, 2024 Commission meeting, Plaintiff specifically informed him that he had conducted extensive conflict-of-interest research, walked Williams through the applicable ethical standards, and explained why no conflict existed under the Tennessee Rules of Professional Conduct or ABA Model Rules. Further, by that time Williams had received, from Darnall, copies of Plaintiff's detailed BPR responses, which cited controlling ethics opinions and rules and exhaustively explained the absence of any concurrent conflict.

99. By omitting all of this exculpatory information, refusing to acknowledge the 2017 vintage and closed status of the prior Millersville lawsuit, and nevertheless publishing Gregory's "That's a conflict of interest" accusation as though it were true and conclusive, Williams and NewsChannel 5 affirmatively created a false narrative and did so with actual malice— at minimum, with reckless disregard for the truth of Plaintiff's ethical compliance.

100. Defendants' attacks went far beyond alleging supposed "ethical" issues and crossed into branding him a dangerous ideologue. Phil Williams repeatedly labeled Plaintiff a "right-wing extremist" and grouped coverage of Millersville under his sensationalized "Hate Comes to Main Street" branding, falsely associating Plaintiff with white supremacists and KKK members.

101. For a civil rights attorney, this is among the most damaging accusations that can be made. Plaintiff has spent his career advocating for civil rights, including serving on the "Civil Rights Cold Cases Committee," a group dedicated to investigating racially motivated lynchings of African Americans that might still be prosecutable. He has filed multiple lawsuits on behalf of Black plaintiffs, including one against individuals suspected of KKK affiliation or racist discrimination—facts that Williams and his colleague Levi

Ismail knew or should have known, because Ismail himself reported on one such case, *Black et al. v. City of Millersville*, which settled more than a year before Plaintiff was asked to serve as City Attorney.

102. By nonetheless packaging Plaintiff as part of a supposed "hate" or "QAnon" movement, Defendants knowingly inverted reality and published accusations that are the polar opposite of Plaintiff's actual record, thereby inflicting extreme reputational harm with actual malice.

103. The May 2024 coverage and ensuing BPR filings were not spontaneous, but the product of coordinated planning among Williams, Darnall, Templet, and Freedle. Having known Williams for more than a decade and observed how he cultivates sources and builds stories, Plaintiff recognizes that Williams's decision to omit Dustin Darnall's name from the May 22, 2024 broadcast was no accident. Williams knew that Darnall intended to recycle the segment as "evidence" in yet another BPR complaint and deliberately kept Darnall off-screen and unnamed so that the broadcast could be presented to disciplinary authorities as if it were an independent, third-party news report rather than the product of their joint effort.

104. On May 24, 2024, Darnall did exactly that, filing a new BPR submission that simply repackaged the NewsChannel 5 segment as "new evidence." Parroting the broadcast, he alleged that Plaintiff had "advised his client, the City of Millersville, to not take action against his other client, Shawn Taylor." In support, Darnall attached a copy of Plaintiff's privileged email to the Board of Commissioners—an email Darnall could only have obtained from Commissioner Templet, who had already supplied it to Williams. That email does not say what Darnall and Williams claimed; to the contrary, Plaintiff carefully advised

the Board that, in his role as City Attorney, his duty was to protect the City from liability, and he specifically warned that "[i]n light of the black-letter First Amendment law set forth above, I strongly advise reconsidering the proposed course of action for calling a Special Call Meeting regarding Asst. Chief Shawn Taylor." Thus, the very document Darnall and Williams relied upon refuted their accusation; their contrary characterization was knowingly false.

*Politically Motivated Ouster of Mayor Long: Plaintiff's Representation as Core Private-Citizen Speech on a Matter of Public Concern*

105.     The ouster suit against Mayor Tommy Long was itself a politically motivated attack designed to punish Long for engaging in protected speech and whistleblowing about public corruption. The ouster petition sought to remove Long from office because he had contacted various government officials, including members of the Sumner County Commission and District Attorney Ray Whitley, to report corruption, voter fraud, election fraud, and other felonies allegedly committed by then-Commissioner Cristina Rosado Templet. Although Cristina Templet was not named as a relator, the action was filed on behalf of her husband, Winston Templet, her son, and several of the Templet family's business partners. In related litigation under the Open Meetings Act, attorney Jack Freedle inadvertently referred to Cristina Templet as his "client," and documents produced in that matter show Templet and Freedle communicating in an attorney–client capacity— communications on which Templet accidentally copied Plaintiff, or which Freedle later filed as exhibits—confirming that the ouster was, in substance, an effort by the Templets and their allies to retaliate against Long.

106. Plaintiff's appearance for Mayor Long in the ouster action was therefore participation in a case that squarely involved matters of public concern: whether political opponents could use the courts to overturn the voters' will and paralyze Millersville's government in an election year. Long, Commissioner Milton Dorris, and newly elected Commissioner Alisa Huling—who had just won a special election by a landslide—formed the reform majority on the City Commission.

107. By representing Long, Plaintiff sought both to prevent the Templets from manufacturing another 2–2 deadlock that would hamstring City operations and to avoid being placed in the untenable position of having to represent the ouster relators themselves in a frivolous case. In other words, Plaintiff's role was aligned with the citizens of Millersville who had voted for change and to keep the City Commission moving in the direction favored by the voters.

108. In the ouster case, Plaintiff filed motions to dismiss that raised dispositive jurisdictional challenges, including the fact that Freedle did not represent "ten freeholders" as required by Tenn. Code Ann. § 8-47-101 *et seq.* The court initially dismissed the ouster petition, but later allowed Freedle to refile. When faced with Plaintiff's jurisdictional and constitutional arguments, Freedle responded not by curing the defects, but by moving to disqualify Plaintiff as counsel on the ground that Plaintiff was supposedly a "necessary witness," thereby attempting to sideline a political and legal opponent rather than litigate the case on its merits.

109. On May 25, 2024, Darnall submitted yet another BPR supplement attaching an unfiled *draft* ouster complaint authored by Freedle against Mayor Tommy Long, asserting that Plaintiff was a "material witness" and accusing him of representing conflicting parties.

The documents Darnall attached bore no file-stamp, demonstrating that he received them directly from Freedle before filing—further proof of their ongoing coordination.

110. Plaintiff's decision to defend Mayor Long in that frivolous ouster action was itself core political speech and petitioning activity on a matter of public concern: the future of Millersville's government and the right of voters to be represented by an elected mayor. Plaintiff deliberately drafted the ouster pleadings to set forth, in detail, the reform administration's account of the corruption and dysfunction they had uncovered so that the public, the press, and other officials could access that narrative through the judicial record and report on it under the fair-report privilege. Far from creating a conflict, Plaintiff's representation of Long and his advocacy in the ouster litigation were fully consistent with his public-interest work for the City and shielded by the First Amendment.

111. The ouster petition itself confirms that Defendants targeted Plaintiff Kroll for his perceived association with a particular political faction and for protecting core political speech. The petition expressly alleges that Plaintiff acted as a "personal attorney" to Commissioners whom Freedle and his clients labeled as members of the "Sumner County Constitutional Republicans" ("SCCR"), and faults Plaintiff for having thwarted Commissioners Templet and Gregory's efforts to stage an inquisition into Assistant Chief Shawn Taylor's podcast commentary—speech Taylor made as a private citizen on matters of public concern.

112. These allegations demonstrate that, in the eyes of the ouster relators, Plaintiff was not functioning as a neutral "public employee," but as a private advocate aligned with SCCR and with the constitutional rights of disfavored speakers. At minimum, the petition shows that Defendants perceived Plaintiff's conduct as political, private-citizen speech and

punished him for it, and that they viewed Plaintiff himself as part of the SCCR faction they sought to drive from power.

113.     On June 1, 2024, Darnall publicly amplified the NewsChannel 5 broadcast on social media, posting celebratory comments and praising Williams under a post by one of his and Templet's political allies that read "Arrivederci SCCR and Mansfield!"—a taunt aimed at the Sumner County Constitutional Republicans ("SCCR") faction Darnall opposed. Darnall's remarks, and Templet's approval of them, confirm that their complaints, record requests, and media coordination were politically motivated attacks directed at Plaintiff and other members of the reform administration whom they perceived as aligned with SCCR, not genuine efforts to address any bona fide ethics concern.

***Plaintiff Never Generated or Admitted to Generating Reports Used by Shawn Taylor***

114.     The June 5, 2024 NewsChannel 5 article titled *"Millersville city attorney admits he generated reports used by conspiracy cop, but denies conflict of interest"* is materially false, misleading, and ethically irresponsible. The headline and lede assert that Plaintiff "admits he used his old law firm's accounts to generate research reports that have fueled some of Shawn Taylor's bizarre conspiracy theories," and that he did so "even as Kroll encouraged the Millersville Board of Commissioners not to hold a special meeting to investigate his client" Taylor.

115.     In reality, Plaintiff never claimed that he personally "generated" the reports at all, let alone for Shawn Taylor. Plaintiff asked Williams what reports he was referring to, and Williams never even gave a date.  In a text message selectively quoted by Williams, Plaintiff explained that the LexisNexis reports that were generated were public-records reports accessed through his former firm's account, which would have been part of routine

legal due diligence for clients in litigation or anticipated litigation. Those clients later gave Taylor permission to use information they already knew he possessed. Williams deliberately twisted this narrow explanation into an "admission" that Plaintiff had recently created research for "conspiracy theories," thereby attributing to Plaintiff a motive and purpose that the text itself refutes.

116.     Defendant Williams also knew that this framing was false because he and his colleague Levi Ismail had already received those same reports *from Shawn Taylor himself* in the spring of 2023—long before Plaintiff became Millersville's City Attorney—when Taylor provided them as a confidential source and told them he had his own access to LexisNexis for public-records searches, as reflected in contemporaneous text messages between Ismail and Taylor. Instead of acknowledging that timeline, Williams affirmatively suggested to viewers that Plaintiff had recently generated special "conspiracy" dossiers for Taylor using a former firm's credentials, and that this somehow proved Plaintiff was ethically compromised.

117.     By omitting the fact that NewsChannel 5 already had obtained the documents from Taylor in 2023, and that Taylor had represented to them that he had independent LexisNexis access, Williams concealed his own role in cultivating Taylor as a source and falsely shifted responsibility onto Plaintiff.

118.     The article confirms that Williams had received the BPR complaints. Williams had to have knowledge of those BPR complaints to ask the question, "'Is there a complaint against you with the board?' *NewsChannel 5 Investigates* asked Kroll." This disclosure by Williams constituted an unethical disclosure of what is a confidential proceeding.

119.    Any ethical concern arising from those searches would fall, if at all, on Plaintiff's former partner, W. Gary Blackburn, who chose to give a public quote to his friend Phil Williams attacking both Plaintiff and Blackburn's own former client, Shawn Taylor.

120.    In any event, there was nothing unlawful about the searches, and, following Williams's stories, Plaintiff successfully passed LexisNexis credentialing audits, which confirmed his full compliance with LexisNexis's terms of use and refuted the broadcast's insinuations.

121.    Williams's reporting also falsely implies that Plaintiff "hacked" or otherwise stole his former law firm's LexisNexis credentials to generate records for Shawn Taylor. By repeatedly emphasizing that Plaintiff "used his old law firm's accounts" and juxtaposing that phrase with ominous references to "conspiracy theories" and "internal investigations," while never disclosing when the reports were actually generated, Williams invites a reasonable viewer to believe that Plaintiff secretly and recently accessed a system to which he no longer had lawful access, suggesting criminal conduct such as computer fraud or unauthorized access. In truth, the reports at issue were run legitimately while Plaintiff was still with the firm, more than eighteen months before the June 2024 story, and were later shared by Taylor with NewsChannel 5.

122.    Williams' deliberate omission of the dates of both the LexisNexis searches and Taylor's podcast, coupled with his loaded language, created the false and defamatory impression that Plaintiff was currently misusing credentials and engaging in ongoing, unethical—and potentially criminal—behavior, when no such conduct occurred.

123.    The June 5 article also employs a deceptive false impeachment trick to portray Plaintiff as dishonest about his advice to the Board of Commissioners. The story states that,

at the commission work session, "Kroll complained" about an earlier NewsChannel 5 piece titled "Don't investigate my client …" and that "The attorney claimed he never encouraged the commission not to investigate Taylor," followed by the quote: "I never once said that." Williams then claims to "read the words from his own email"—the single sentence, "I strongly advise reconsidering the proposed course of action for scheduling a special-called meeting"—and presents Plaintiff's acknowledgment that those were his words ("Sure, did … It's only my duty to advise them what the legal implications are") as if it were a confession that he had been untruthful.

124.     In context, however, Plaintiff's statement "I never once said that" referred specifically to Williams's fabricated headline, "Don't investigate my client," which uses Williams's own words, not Plaintiff's. In the email itself, Plaintiff clearly identified the City as his client, never once wrote "do not investigate," and merely advised that the *particular* proposed special-called meeting—framed around interrogating Taylor about his political views and podcast speech—would expose the *City* to First Amendment liability. Williams's decision to replace Plaintiff's actual statement with his own headline, then "impeach" Plaintiff using a different line from the email stripped of context, is a calculated misrepresentation, not good-faith reporting.

125.     Further, the article omits exculpatory information that Williams already possessed and that directly undercuts the "conflict of interest" narrative he promotes. By June 5, Williams had been provided, through Dustin Darnall, with Plaintiff's detailed BPR responses, which walk through the Tennessee Rules of Professional Conduct, ABA Model Rules, and informal ethics opinions and explain why Plaintiff's past representation of Taylor in a *2017* case against Millersville, and his separate representation of Taylor and

Chief Morris in a lawsuit against the Town of Ridgetop, created no concurrent conflict with his service as Millersville's City Attorney. He also knew, from those same materials, that no litigation against Millersville was pending when Plaintiff was appointed. Yet the June 5 article never discloses this legal analysis, instead presenting one-sided quotes from Gary Blackburn and political opponents Gregory and Templet to suggest that Plaintiff's "multiple hats" are inherently unethical and that Plaintiff is "more concerned about protecting Millersville's conspiracy cop than … protecting Millersville."

126. By suppressing the contrary evidence in his possession and staging a contrived "gotcha" exchange on camera, Williams and NewsChannel 5 knowingly created a false and defamatory impression of Plaintiff's honesty and professional integrity, in reckless disregard of the truth and in violation of basic journalistic ethics.

127. On June 6, 2024, in lock-step with the conspiracy with Phil Williams, Darnall lodged yet another BPR submission, this time recycling the June 5, 2024 NewsChannel 5 broadcast that insinuated misuse of Plaintiff's former law firm's LexisNexis public-records account. The accusation was baseless and, even if true, would not have implicated any rule of professional conduct governing Plaintiff's work as City Attorney.

128. On June 7, 2024, Plaintiff filed a response expressly warning the BPR that Darnall's leaks and media coordination violated Rule 9's confidentiality provisions and requesting that contempt proceedings be initiated. The BPR served Plaintiff's response on Darnall—who, immediately thereafter, ceased filing new complaints.

129. Notably, Darnall has never once denied Plaintiff's allegation that he was using the BPR process to funnel information to Williams for political smears, a silence that is highly probative of the coordinated and abusive nature of his conduct.

130.     Tennessee courts recognize that when an incriminating statement is made in the presence and hearing of a person and that person does not deny or object to it, both the statement and the failure to deny may be treated as evidence of the person's acquiescence in its truth—often described as an "admission by silence." *See, e.g., Ledune v. State*, 589 S.W.2d 936, 939 (Tenn. Crim. App. 1979) (collecting cases).

131.     Here, after Plaintiff formally alleged in his June 7, 2024 response that Darnall was leaking BPR materials to Phil Williams and requested contempt proceedings on that basis, Darnall abruptly ceased filing further complaints and never once denied the accusation that he was coordinating with Williams and misusing the BPR process for political and media purposes.

132.     Given Darnall's prior pattern of rapid rebuttals and serial supplemental filings, his sudden silence in the face of a direct, serious allegation is highly probative. Under well-settled Tennessee law, Darnall's failure to deny the charge constitutes an admission by silence confirming that he was, in fact, feeding confidential BPR information to Williams and weaponizing the disciplinary process for political and journalistic ends.

133.     Once Darnall abruptly ceased filing BPR complaints in early June 2024, his role in the campaign was immediately assumed by former City Attorney Jack Freedle, who represented the Templets. On June 19, 2024, Freedle submitted his own BPR complaint because Darnall refused to submit any more Complaints on Defendant Templet's behalf after Plaintiff's request that the BPR initiate criminal contempt proceedings.

134.     The attachments to Freedle's filing included emails in which Commissioner Cristina Templet forwarded Plaintiff's legal opinions and other City communications directly to Freedle for use in her litigation and lawfare efforts, confirming that the Templets

and their attorney were actively weaponizing City work product for partisan gain and to attack Plaintiff.

135.    Defendant Templet admitted she was in frequent contact with Phil Williams and had also forwarded all of Plaintiff's emails to the Board to Phil Williams as overt acts in furtherance of their conspiracy.

136.    In that BPR complaint, Freedle relied heavily on an order entered by Chancellor Oliver disqualifying Plaintiff from representing Mayor Tommy Long in the ouster action that Freedle had filed on behalf of the Templets.

137.    The hearing on that motion to disqualify was conducted by Zoom and attended not only by the parties and their counsel, but also by Dustin Darnall, Phil Williams, and NewsChannel 5 reporter Levi Ismail—further evidence of Darnall and Williams's coordinated involvement and of the fact that such modern court proceedings function as public forums.

138.    Plaintiff's written filings and oral argument in that ouster case were drafted with the understanding that they would be viewed by the public and the press, and were intended to present the reform administration's side of the story regarding corruption in Millersville. Plaintiff's advocacy for Mayor Long in that case thus constituted core First Amendment activity—petitioning the courts and speaking as a private citizen on matters of public concern, including government integrity, misuse of public office, and the rights of Millersville voters.

139.    Although Plaintiff believed that Chancellor Oliver's disqualification ruling was legally erroneous, the order itself does not suggest any ethical violation.

140.     The order expressly states that "the City is not a party or interested" in the ouster action and that Plaintiff knew or should have known as much—meaning that, as a matter of law, Plaintiff was not representing the City in that case and was not acting as a "public employee" when he spoke and litigated on Mayor Long's behalf.

141.     For purposes of Plaintiff's First Amendment claims, this judicial finding confirms that Plaintiff was operating in a purely private capacity when he advocated for Long and his administration, whom Defendants perceived as aligned with the Sumner County Constitutional Republicans ("SCCR"), and that any retaliation for that advocacy was directed at his protected private-citizen speech.

142.     Jack Freedle later nonsuited the ouster petition—consistent with Plaintiff's view that it was baseless.  Indeed, withdrawing an ouster complaint is evidence that the lawsuit itself was frivolous under T.C.A. § 8-47-122(b), which allows for a Rule 11 award of attorney's fees against the complainant if the complaint is "subsequently withdrawn."  That nonsuit undercuts any claim that Plaintiff's disqualification was needed to preserve fairness in a case that could not meet the ouster statute's threshold, and is evidence of Plaintiff's protected speech about a matter of public concern.

143.     Once Shawn Taylor became Assistant Chief of Police in Millersville, however, Defendants Phil Williams and Levi Ismail betrayed Taylor's trust, turning him from a source to a scapegoat.   They exploited every scrap of confidential information that Taylor had provided to them in January of 2023, and used Taylor's appointment as Assistant Chief of Police to manufacture a fake "public crisis" where none existed, thereby exploiting a source for his own partisan purposes and as overt acts in furtherance of his illegal objectives and those of the other Defendants.   In so doing, Williams and the Channel 5 Media

Defendants forfeited any claim that they were ever reporting on a legitimate controversy. Their conduct was a calculated smear campaign aimed squarely at undermining Shawn Taylor, and then through false and defamatory claims against Plaintiffs Michael Candler and Todd Dorris.

144.    The May 20, 2024 article also quoted only part of what Taylor said in one of the dated podcasts to make it appear that he was currently investigating and accessing the financial data for U.S. Senator Marsha Blackburn via law enforcement databases, which Phil Williams knew was false. In fact, the video was from years prior to Taylor becoming Assistant Police Chief and he was referring to publicly-available bank records filed as part of Blackburn's campaign disclosures. Without any evidence, Phil Williams speculated that Taylor must have been abusing a law enforcement database because Taylor had called Williams by a different last name, even though that last name is publicly available and can be found in online search engines.

145.    On May 22, 2024, Williams ran another story about Millersville Commissioner Templet and Gregory demanding an inquisition into the hiring of Shawn Taylor. Millersville Commissioners have no authority to either conduct an inquisition during a City Meeting and have no authority to make or influence any hiring decisions, which authority is solely that of the City Manager under Millersville's charter. Williams speculated again that Taylor used a government database to investigate Williams. However, it is easy for law enforcement agencies to conduct an audit of a police officer's queries made in government databases, and there has never been any evidence that Taylor queried Phil Williams. Phil Williams is nowhere mentioned in any of the available information from the TBI, such as their search warrants, which do not mention Phil Williams at all. Despite

Williams' lack of evidence, he continued running attack pieces against Taylor, Plaintiff, and other Millersville officials every other day, and even published different stories twice a day as part of an unprecedented campaign.

***October–December 2024: Election Interference***

146.      By the autumn of 2024, the coordination between Dustin Darnall, Jesse Powell, David Gregory, and Phil Williams had evolved into a full-scale election strategy. On October 22, 2024, Darnall and Powell joined a media-driven letter campaign to House Speaker Cameron Sexton, attacking Representative Bud Hulsey, a state legislator who had defended the Millersville Police Department and raised questions about the Tennessee Bureau of Investigation's (TBI) politically charged actions at Millersville via a private letter.

147.      Representative Hulsey's original letter—sent to TBI Director David Rausch on or about October 11, 2024—expressed concern that the TBI's conduct appeared politically motivated, citing the agency's apparent coordination with Phil Williams and NewsChannel 5. Director Rausch responded to Hulsey on October 15, 2024. The very next day, October 16, 2024, Phil Williams submitted a targeted public-records request to the TBI and, just six days later, published an article based on that very correspondence. The compressed sequence of events, together with the selective framing of Williams's reporting, evidences an ongoing information pipeline between the TBI and NewsChannel 5—a channel exploited to sustain defamatory narratives against Millersville's law enforcement officers and its administration.

148.      Williams's supposed "discovery" of Representative Hulsey's letter further exposes that coordination. In his article, Williams claimed that "the letter was obtained by

NewsChannel 5 from the TBI through a public records request following some recent claims by Taylor that he had the support of state lawmakers." That assertion cannot be accurate: Williams did not direct his request to the General Assembly but to the TBI itself, indicating that he already knew the agency possessed the document. The only plausible explanation is that one or more individuals within the TBI tipped Williams off in advance, enabling him to tailor his request precisely to that letter before it was publicly accessible.

149. On October 22, 2024, NewsChannel 5 aired and published Williams's story under the headline "GOP lawmakers threaten 'political fallout' for TBI's Millersville investigation." The piece revived previously debunked insinuations concerning Detective Todd Dorris and others, recycling the same false premises from Williams's earlier broadcasts. The article quotes John Ray Clemmons, who is a close ally and former associate of Gary Blackburn.

150. The same political and media network driving the Millersville smear campaign also fueled the unprecedented outside spending that reshaped the City's 2024 election. NewsChannel 5, and individuals closely associated with it, were tied to The Best of Tennessee Victory Fund, a political action committee that poured record amounts of money into Millersville's local race on behalf of Dustin Darnall, Jesse Powell, and Lincoln Atwood.

151. One major donor, "Best of Tennessee, Inc.", was a fictitious entity that contributed $120,000 to the PAC and listed its address as 414 Union Street, Suite 1900, Nashville, TN—the exact address of the law firm owned by John Ray Clemmons, a former long-time associate of Gary Blackburn and a personal friend of both Blackburn and Phil Williams.

152. Clemmons is not a peripheral figure. He became Chairman of the Tennessee House Democratic Caucus in 2022 and previously served as Political Director of the Tennessee Democratic Party. For at least nine years, he worked under Blackburn at Blackburn & McCune, maintaining ongoing political and personal ties to both Blackburn and Williams.

153. Clemmons also sits on the Columbia University Alumni Representative Committee—the same institution that awarded Phil Williams the DuPont-Columbia journalism prize for his series of defamatory "investigations" into Millersville. Over the past five years, Williams has repeatedly featured Clemmons as a quoted source in partisan-framed stories, using him to amplify Democratic talking points on Medicaid expansion, school vouchers, and attacks on conservative legislation.

154. On October 22, 2024, NewsChannel 5 published yet another "investigative" piece quoting Clemmons as its lead source to attack Rep. Bud Hulsey, who had written a letter defending the Millersville Police Department and questioning the TBI's political bias. In the same article, Dustin Darnall and Jesse Powell appeared as co-authors of a letter praising Williams and condemning Hulsey—further proof of coordination between Williams, his political allies, and Millersville's reform candidates.

155. Channel 5's story distorted Hulsey's letter, falsely framing it as a "threat of political fallout," while omitting entire sections that revealed his legitimate concern that the TBI appeared to be initiating investigations at the prompting of a partisan journalist. Clemmons's assertion that Hulsey could "interfere" with the TBI was blatantly false—the TBI is an independent law-enforcement agency, not under legislative control.

156. Ironically, while Clemmons routinely reposts Phil Williams's stories on social media, he conspicuously avoided sharing this one—the story where he served as

Williams's chief attack surrogate. The selective silence underscores what this entire campaign represents: a politically synchronized operation linking media influence, partisan funding, and weaponized "investigations" to control Millersville's government through deception and manufactured scandal, and to retaliate against Plaintiff and members of his administration based on perception of political affiliation and protected speech.

157.     On October 24, 2024, Williams cited and amplified a public statement, purportedly from Dustin Darnall and Jesse Powell—who defended Williams's reporting—to attack Representative Hulsey for questioning the TBI's conduct. This is another instance of Darnall using a written script with Phil Williams, and Plaintiff avers that it was also written by Williams.   This exchange cemented the collaborative nature of the operation: Williams supplied the media narrative, while Darnall and his political allies echoed it to advance their campaign objectives in the weeks leading up to the municipal election:



It is evident that Reps. Hulsey and Fritts have bene speaking directly with Shawn Taylor and have fallen for his deception. The letter authored by Reps. Hulsey and Fritts is filled with frequent inaccuracies, some of which we will address below.

First, Hulsey and Fritts stated "this investigation appears to have been triggered by intentionally misleading stores from one media outlet" when, in fact, this investigation appears to have been triggered when a Millersville Detective allegedly committed perjury after a botched child predator sting from May. In that botched sting, Millersville Police

disregarded guidance from a District Attorney that, to abide by TN law, only law enforcement officers must be the operators the electronic devices in the sting when communicating with the targets. There is video evidence that this guidance was not accepted and those other than law enforcement officers were operating the electronic devices during this sting. An arrest was made and when this person had a hearing, a Millersville Detective stated under oath that only Millersville Officers operated the electronic devices.

This set of facts lead to District Attorney Nash (19th Judicial District) asking the TBI to investigate. It appears something was found during that investigation, and the investigation expanded to include a request from District Attorney Whitley (18th Judicial District). We are attaching a screenshot from a WSMV report that shows the first pages of the TBI search warrants served on the Millersville Police Department in September. You can see that the TBI is investigating Aggravated Perjury (TCA 36-16-703) and Official Oppression (TCS 39-16-403) in one search warrant and Official Misconduct (TCA 39-16-402) in the other search warrant. We do not believe the search warrant served on Assistant Taylor's residence has been released.

Second, it is unclear how House Representatives can make any determination that a TBI investigation lacks a clear legal basis. There is concern from many in our community that Millersville Police have been conducting politically motivated investigations into those they consider to be their political rivals. It seems reasonable to conclude that the TBI is investigating this perceived Official Misconduct. In the search warrant for Official Misconduct, the TBI was authorized to collect information about a lengthy list of individuals. If you scrutinize this list, you will see it contains many political rivals of the current Millersville administration.

As candidates for the Millersville Commission, we welcome the TBI to investigate Millersville. We have a long history of issues. The TBI investigation needs to continue until it is concluded and come what may.

We look forward to your consideration of this issue.

Sincerely,

*[signature]*

Dustin Darnall
Candidate for Millersville Commission

*[signature]*

Jesse Powel
Candidate for Millersville Commission

*Protected Speech On Matters Of Public Concern*

158.    Slater's Creek is a historically and environmentally significant waterway in Millersville, Tennessee. It is fed by numerous clear springs and tributaries and ultimately flows into Mansker's Creek, which is designated as a protected "exceptional" waterway under Tennessee law and is habitat for the endangered Streamside Salamander.

159.    Before reaching Mansker's Creek, Slater's Creek runs through the property at 1149 Louisville Highway in Millersville, where Shane Trucking has operated an illegal landfill and quarrying operation, constructed an unpermitted bridge over the creek, and for years

allowed dump trucks to deposit dirt and debris onto public roadways, decreasing visibility for drivers and causing sediment and pollutants to wash into the creek.

160. As City Attorney, Plaintiff drafted and filed an Answer and Counter-Complaint on behalf of the City of Millersville against Shane Trucking that documented ongoing violations of municipal stormwater, zoning, and environmental ordinances; the illegal discharge of contaminated soil and debris into Slater's Creek; and the resulting public health and safety hazards to Millersville residents and motorists.

161. The Counter-Complaint alleged, among other things, that soil hauled from the Tennessee Titans stadium excavation and deposited at Shane Trucking's Millersville site contained arsenic, lead, dieldrin, PFAS, and other hazardous substances in excess of Residential Soil Regional Screening Levels, posing significant risks to drinking water, human health, and the environment.

162. Plaintiff's litigation filings sought declaratory and injunctive relief, civil penalties, and abatement of a public nuisance, specifically to stop the dumping of contaminated soil, prevent illicit discharges into Slater's Creek and Mansker's Creek, and compel remediation of environmental damage threatening the health, safety, and welfare of the public.

163. In preparing and filing the Answer and Counter-Complaint, Plaintiff spoke out about matters that affect the community at large, including protection of public waterways, enforcement of stormwater and environmental laws, contamination of an exceptional waterway, roadway safety, and the City's obligation to safeguard residents from environmental and public-health hazards. These are core matters of public concern, not private workplace grievances.

164.     Plaintiff's speech also addressed governmental integrity and honest enforcement of the law. The Counter-Complaint detailed a pattern in which Shane Trucking misrepresented its activities to regulators, operated as a de-facto landfill and quarry without proper authorization, profited substantially from illegal operations, and attempted to evade environmental and zoning oversight at the expense of the Millersville community.

165.     Worse yet, the prior administrations had failed to even require that Shane Trucking obtain a $15.00 business license which would have raked in millions in tax revenue that the City desperately needed, which Plaintiff's enforcement action forced them to obtain.

166.     During the 2024 municipal election cycle, Defendants Dustin Darnall and Jesse Powell accepted monetary campaign contributions and other political support from Shane Trucking, LLC and/or its owners and principals. Those contributions created an actual and perceived conflict of interest between Defendants' duty to enforce the law on behalf of the public and their financial relationship with Shane Trucking.

167.     After assuming office, Defendants Darnall and Powell used their authority as elected City officials to direct the City Attorney who replaced Plaintiff to "do nothing" in the Shane Trucking litigation, including by instructing the City's counsel not to pursue the City's Counter-Complaint, not to seek civil penalties, and not to aggressively enforce the Stop Work Order or other environmental protections against Shane Trucking.

168.     By publicly alleging that Defendants Darnall and Powell accepted campaign contributions from Shane Trucking and, once in office, interfered with ongoing environmental enforcement and litigation to benefit that campaign donor, Plaintiff is speaking about governmental corruption, pay-to-play politics, selective non-enforcement

of the law, and abuse of public office—issues that go to the heart of democratic self-governance and are matters of the highest public concern.

169.     Plaintiff's drafting and filing of this Answer and Counter-Complaint constitutes petitioning activity and political speech criticizing the manner in which Defendants have handled an environmental enforcement action, exposed conflicts of interest, and misused their public offices to shield a politically connected polluter from accountability. This lawsuit is therefore protected expression under the First Amendment's Free Speech and Petition Clauses.

170.     Plaintiff's speech in the Shane Trucking stop work order and Answer and Counter-Complaint, subsequent public statements about the dangers posed by Shane Trucking's operations, and the allegations contained in this federal Complaint do not seek any purely private employment benefit for Plaintiff. Instead, they seek to protect Millersville residents' rights to clean water, safe roads, transparent government, and even-handed enforcement of environmental and zoning laws—matters of public concern entitled to full constitutional protection.

171.     At all relevant times, Defendants Darnall and Powell were aware that Plaintiff's speech concerned environmental contamination of protected waterways, public health risks from contaminated soil and airborne particulates, and the integrity of City decision-making in the face of campaign contributions from Shane Trucking. Their efforts to silence, punish, or chill Plaintiff for that speech were motivated by disagreement with his protected expression on these public issues.

172.     Plaintiff's Answer and Counter-Complaint in the Shane Trucking lawsuit placed at issue the dumping of PFAS-contaminated soil and other hazardous substances into

waterways that ultimately supply drinking water to hundreds of thousands, if not millions, of Middle Tennesseans.

173.    The presence of "forever chemicals" such as PFAS in public drinking water systems is a matter of intense public concern, widely covered by local and national media as a serious environmental and public-health crisis.

174.    At the same time that Plaintiff and his administration were pursuing the Shane Trucking litigation to protect Millersville's waterways and downstream drinking water supplies, Defendants WTVF, Phil Williams, and Levi Ismail aired multiple stories attacking Plaintiff and his administration, portraying them as corrupt, lawless, or incompetent.

175.    Despite their claimed role as "watchdog journalists" and their extensive coverage of Plaintiff, neither Phil Williams nor Levi Ismail nor any other WTVF reporter ever mentioned the Shane Trucking lawsuit, the allegations of PFAS and other toxic pollutants, or the threat to Middle Tennessee's drinking water in any broadcast, online article, or social-media posting.

176.    The Shane Trucking stop work order and lawsuit was, by any conventional standard of newsworthiness, at least as significant as, and in many cases more significant than, the matters Defendants repeatedly chose to cover about Plaintiff's administration, because it involved alleged contamination of regional waterways with carcinogenic "forever chemicals" and the City's efforts to stop it.

177.    Defendants were aware of the Shane Trucking stop work order and litigation and the environmental issues it raised through press releases, court filings, public meetings, and

communications from City officials, yet consciously chose to ignore and suppress any mention of that case and its allegations.

178.  Defendants' complete silence about the Shane Trucking stop work order and lawsuit, contrasted with their aggressive and repeated coverage of narratives supplied by Plaintiff's political enemies, evidences that Defendants were not acting as neutral journalists, but as media allies of the state and local officials who sought to discredit and remove Plaintiff because of his protected speech and reform efforts.

179.  Defendants' editorial decision to omit any coverage of Plaintiff's work exposing PFAS contamination and prosecuting Shane Trucking, while amplifying accusations and talking points originating from those same state actors, aligns Defendants with the goals and messaging of those officials rather than with the public's interest in honest reporting.

180.  On information and belief, Defendants' refusal to report on the Shane Trucking lawsuit was not an accident or oversight, but part of a coordinated, viewpoint-discriminatory campaign to portray Plaintiff exclusively in a negative light, to conceal his efforts to protect public health and the environment, and to support the agenda of state actors who opposed his First Amendment protected speech and policy initiatives.

181.  By selectively suppressing news of Plaintiff's environmental enforcement actions while echoing the narrative of the state actors targeting him, Defendants acted as de facto partners and co-conspirators of those officials, using the power of mass media to assist in retaliating against Plaintiff for his protected speech, petitions, and advocacy.

182.  Defendants' pattern of coverage and non-coverage would have been materially different if Plaintiff's speech had aligned with the interests of the state actors who supplied Defendants with tips, leaks, and interviews; instead, because Plaintiff's speech challenged

powerful political and economic interests—including Shane Trucking and its allies—Defendants helped those interests marginalize and punish Plaintiff by omitting his public-spirited actions from the public record.

183.     The intentional omission of the Shane Trucking litigation from Defendants' reporting thereby serves as circumstantial evidence that Defendants were aligned with, and acting in concert with, the state actors who targeted Plaintiff and his administration in retaliation for Plaintiff's exercise of his First Amendment rights to speak, petition, and advocate on matters of public concern.

***Plaintiff's Protected Out-of-Court Statements on Matters of Public Concern and Defendants' Retaliatory Efforts to Silence Him***

184.     Throughout his tenure as City Attorney, Plaintiff Bryant Kroll, regularly communicated with journalists and the public regarding City governance, public safety and emergency-response capacity, code enforcement and building safety, the City's legal exposure and risk management, and alleged misconduct by public officials. These communications—whether given by interview, email, phone, or written statement—were out-of-court statements addressing matters of public concern, because they directly affected residents' safety, municipal spending, and the integrity and accountability of local government.

185.     Plaintiff's press communications were an established part of his value to the City and a known reason he was engaged as City Attorney: Plaintiff had long-standing media contacts and prior experience with news interviews, including with Defendant Levi Ismail, and he used those relationships to provide accurate information, correct misinformation, and communicate the City's improvement efforts. Plaintiff likewise made out-of-court

statements on matters of public concern to numerous other Middle Tennessee outlets about initiatives to improve Millersville, including pursuing grants and infrastructure solutions, abating blight and illegal operations, and advancing public-safety and community projects—communications that enabled residents to understand and participate in local government.

186.     Defendant Ismail, through official NewsChannel 5 platforms and his social-media presence, published and amplified reporting concerning Plaintiff and the City's affairs, including reporting that quoted, summarized, or relied upon Plaintiff's statements as City Attorney. This media coverage reflected that Plaintiff's statements were made in the midst of public controversy and debate about Millersville's governance and therefore constituted protected speech on matters of public concern.

187.     Defendants Dustin Darnall, Jesse Powell, David Gregory, and Cristina Templet disliked Plaintiff's public-facing communications and press access. Upon taking office, Defendants Darnall and Powell immediately moved and voted to eliminate Plaintiff's ability to speak publicly about any issues concerning the City or handle press inquiries, not to promote accuracy or efficiency, but to silence Plaintiff, curtail transparency, and prevent further discussion of municipal problems and reforms that Defendants found politically inconvenient.  These actions foreseeably chilled Plaintiff's protected speech and interfered with his ability to perform his duties, causing reputational, professional, and emotional harm and other compensable damages.

***The December 17, 2024 Ambush on Plaintiff***

188.     The Defendants' smear campaign reached its intended climax on December 17, 2024, at the first meeting of the newly seated City Commission, when Defendants Dustin

Darnall, Jesse Powell, David Gregory, Phil Williams, and NewsChannel 5 staged a televised ambush targeting Plaintiff's position as City Attorney.

189.     Although newly elected Mayor Lincoln Atwood had privately assured Plaintiff that there would be "no more political theater," NewsChannel 5 cameraman Brian Staples was already set up in the commission chamber before the meeting began, prepared to capture what was a prearranged spectacle.

190.     The December 17, 2024 Regular Commission Meeting was the first meeting of the new Board, and Defendants Darnall and Powell, on cue, used the budget discussion and the "city attorney pay" agenda item as a vehicle to retaliate against Plaintiff for his protected advocacy on behalf of Mayor Long in the ouster case and his public opposition to the prior corrupt administration. During the budget segment, Darnall repeatedly described prior spending as "unwise" and specifically targeted the "legal services" line item for a drastic cut from $100,000 to $45,000.

191.     When the agenda reached "Discussion of City Attorney and voting on setting City Attorney's pay," Darnall introduced, without prior notice, a special resolution "to set the pay of the city attorney," and admitted on the record that it "wasn't sent out in great time" before the meeting—confirming that the measure was designed as an ambush.

192.     The resolution recited that the interim city manager "lacked authority" to enter into Plaintiff's retainer agreement and that the Commission had never "fixed" his salary, even though Plaintiff's contract mirrored the prior City Attorney's agreement and hourly rate and had already been functionally approved and funded by the previously adopted budget. The same resolution stripped Plaintiff of media-contact and open-records responsibilities

that had been expressly delegated to him, further narrowing his role in direct response to his public defense of the administration under attack.

193.　　On cue, Darnall then pivoted away from any neutral discussion of rates and launched into a direct attack – with another scripted statement drafted by Cristina Templet and/or Phil Williams – on Plaintiff's representation of Mayor Long in the ouster case— speech and advocacy that Chancellor Oliver had already held was undertaken in a private capacity and not as representation of the City. Reading selectively from the disqualification order, Darnall told the public that he was "not happy that Millersville had that representation and [it] never should have happened," and used that disagreement with Plaintiff's litigation strategy as the stated reason that "it is appropriate to amend that pay rate down."

194.　　In other words, the only concrete "misconduct" Darnall identified was Plaintiff's decision to challenge the ouster and defend Mayor Long and the reform administration— a paradigmatic example of core political speech and advocacy on a matter of public concern.

195.　　On the heels of that denunciation, Darnall moved to slash Plaintiff's pay from $200 per hour to $15 per hour, and Defendant Gregory immediately seconded the motion. Defendant Powell then voted "aye" on the amendment, joining Darnall and Gregory in approving the 92.5% pay cut, while new Mayor Atwood voted "no." Faced with an intentional destruction of the agreed contract rate, with a resolution that purported to make the pay change retroactive to January 24, 2024, and public accusations that his representation of Mayor Long "never should have happened," Plaintiff stated that the move

constituted "breach of contract and inducement to breach of contract" and tendered his resignation.

196.    Darnall was then captured on recording reassuring Powell, "He's got no suit," openly celebrating the retaliatory nature of the maneuver and its perceived legal impunity.

197.    Their professed concern for "fiscal responsibility" was a pretext. Plaintiff Kroll's legal budget of approximately $120,000 per year was less than a single insurance deductible payment from the City of Millersville's high-risk insurance policy that had to be obtained because of the prior administrations mishandling of City business.

198.    Within weeks, the same Commission reinstated Plaintiff's proposed legal budget and quietly reversed each of the punitive actions taken on December 17, without ever voting on a different rate for their handpicked replacement, Rob Wheeler—who, upon information and belief, was simply paid the same pre-approved amount.

199.    Taken together, the December 17 transcript reveals that Defendants Darnall, Powell and Gregory: (1) used a surprise resolution to strip Plaintiff of duties tied to his public messaging; (2) publicly recited and weaponized a disqualification order arising from Plaintiff's representation of Mayor Long in a highly charged ouster proceeding; (3) proposed and approved a punitive, symbolic $15/hour rate targeted only at Plaintiff; and (4) gloated on the record after forcing his resignation. These actions are classic adverse employment measures taken in direct response to Plaintiff's protected political advocacy and litigation speech, and they provide powerful evidence of retaliatory motive, pretext, and coordinated efforts to silence and punish Plaintiff for speaking as a private citizen on matters of profound public concern.

200.     This sequence confirms that the December 17 ambush was not about finances or governance, but the culmination of months of coordinated defamation and political manipulation—beginning with Darnall's serial abuse of the BPR process, amplified by Phil Williams's one-sided coverage, and ending in a choreographed public spectacle designed to remove Plaintiff and cement the Defendants' partisan narrative.

*Phil Williams' December 18, 2024 "Fresh Start" Article: Capstone of the Smear Campaign and Open Celebration of Plaintiff's Forced Removal*

201.     In furtherance of the retaliatory and defamatory campaign against Plaintiff, Defendants Phil Williams and NewsChannel 5 provided repeated and favorable media coverage to Dustin Darnall, Jesse Powell, Cristina Templet and David Gregory, portraying them as reformers and heroes while painting the Plaintiff's administration—and its officers—as ideologically dangerous "SCCR" extremists and incompetent.

202.     The December 18, 2024 article, *"Hints of drama, yet hope for future as new city commission takes reins in Millersville, Tennessee,"* is itself a capstone in Defendant Williams's months-long campaign to engineer Plaintiff's removal as City Attorney. The article, like all others, was run under the series banner "HATE COMES TO MAIN STREET" and declares in the sub-headline that "controversial city attorney Bryant Kroll abruptly quits as new commission proposes cutting pay from $200/hour to $15," expressly tying Plaintiff's departure to Williams's Hate Group-themed narrative about Millersville and framing the new commission as bringing "hope of a fresh start" only because Plaintiff and the prior "far-right control" were gone.

203.     In doing so, Williams presents Plaintiff's forced resignation not as the result of an unlawful, retaliatory ambush by state actors designed to chill Plaintiff's speech, but as a

welcome and necessary cleansing of "controversy," thereby reinforcing the message that getting rid of Plaintiff was the desired and intended outcome.

204.     Within the body of the article, Williams makes or republishes multiple false and defamatory statements of fact concerning Plaintiff's professional integrity. He states that the commission now had to "decide the fate of City Attorney Bryant Kroll, who has drawn criticism and a rebuke from a local judge for his conflicts of interest," and hyperlinks to the disqualification order in the ouster case as supposed proof that Plaintiff had "conflicts of interest" as City Attorney.   He never mentions that these were not the purported "conflicts of interest" that he had previously reported upon based on Darnall's BPR Complaints leaked to Williams.

205.     In truth, the order expressly states that "the City is not a party or interested," confirming that Plaintiff was acting in a private capacity for Mayor Long, not representing Millersville, and that the ruling was not a "rebuke" of any conflict in his role as City Attorney.

206.     Williams further repeats, without correction, Commissioner Darnall's claim that the City's legal budget had "tripled" after Plaintiff was hired and that Plaintiff's $200/hour rate "was never approved by the commission, as required by law." These statements are false: Plaintiff's rate was identical to former City Attorney Jack Freedle's, was within the already-approved budget, and had been effectively voted upon and ratified by the prior commission; moreover, the "tripled" figure ignores both the City's expanded legal needs to protect from litigation, and prior under-budgeting. By publishing these assertions as factual, without including the readily available contrary information, Williams falsely

portrayed Plaintiff as an unethical lawyer who had engineered an unauthorized, self-enriching arrangement and thereby impugned his fitness to practice law.

207.     Williams also crafts a misleading narrative about the events of December 17 that falsely suggests Plaintiff abruptly and voluntarily abandoned his post. The article emphasizes that when Darnall moved to slash Plaintiff's pay to $15/hour, "That proposal did not sit well with Kroll," quotes Plaintiff's statement that such conduct would be "breach of contract and inducement to breach of contract," then states that "Kroll immediately packed up his computer and left — and, with that, his controversial tenure as city attorney was also finished." This framing deliberately omits all of Plaintiff Kroll's other comments to the Board, including his explanation and colloquy to Darnall, making it appear that the entire walkout was based on money, as opposed to the fact that Plaintiff was tired of debating the law with Darnall, who was not a lawyer.

208.     NewsChannel 5 never did a story about how Plaintiff rescinded his verbal resignation with the City Manager, appeared at the special-called meeting two days later, and informed the commissioners that the resignation had been withdrawn and could not lawfully be "accepted" by them. By declaring that Plaintiff's "controversial tenure… was also finished," Williams falsely conveys to readers that Plaintiff's service ended then and there, by his own hand, rather than through the subsequent, *ultra vires* vote by Gregory, Powell, and Darnall to "accept" a rescinded resignation in retaliation for Plaintiff's protected advocacy.

209.     The December 18, 2024 Article, in context, nonetheless reads as a victory lap: Williams openly tells his audience that the campaign he has been waging against Plaintiff has achieved its objective of forcing Plaintiff out of office.

210.    The article also contains and republishes statements by Darnall that reveal both his retaliatory intent and Williams's knowing collaboration with that goal. Williams quotes Darnall as saying, "We can't pay a $100,000 for a city attorney," as if this were a good-faith budgetary concern, even though the legal budget had already been approved, the same budget and rate were quietly restored for Plaintiff's replacement, and Darnall had elsewhere celebrated the broadcast attacks on Plaintiff as a way to oust the prior "far-right" faction. Williams then gives Darnall the last word on the legal consequences of the December 17 stunt: "He should have waited until we passed the motion," Darnall boasts. "He quit, and the motion was withdrawn — so we never changed his pay." By publishing that quote uncritically, Williams amplifies Darnall's admission that the purpose of the maneuver was to force Plaintiff to quit and to pre-empt any contract claim—precisely the retaliatory motive Plaintiff alleges—while simultaneously allowing Darnall to mislead the public into believing the board had not tampered with Plaintiff's contract at all.

211.    Finally, the December 18 article itself functions as a retrospective "index" of Williams's earlier hit pieces, linking and summarizing prior stories that falsely claimed Plaintiff told the City "not [to] question" Shawn Taylor's "bizarre theories or psychological fitness," that he used old firm credentials to generate LexisNexis reports for "conspiracy theories," and that he played a central role in "far-right control" of Millersville.

212.    By bundling those prior stories into this "fresh start" narrative and placing them immediately after announcing that Plaintiff's "controversial tenure… was finished," Williams publishes all prior stories to new audiences and makes explicit what the months-long pattern already showed: his objective was not to inform the public, but to orchestrate and celebrate Plaintiff's termination by providing political cover and media pressure for

the state actors with whom he conspired and took joint action: Gregory, Powell, Darnall, and Templet.

213.    The December 18 article is thus both a fresh act of defamation and a confession of the conspiratorial purpose that united Williams and these state actors—to remove Plaintiff from office because of his protected speech and his efforts to expose and confront corruption in Millersville.

***The December 19 Special Call Meeting***

214.    After the December 17, 2024 ambush, Plaintiff telephoned City Manager Bryan Morris and unequivocally rescinded the verbal resignation he had tendered in the heat of the moment, explaining that under the City's Charter Millersville could not lawfully conduct business—such as approving ordinances and resolutions—without a duly appointed City Attorney, and that he refused to allow the citizens of Millersville to suffer because of Defendants' political stunt.

215.    Two days after the December 17 ambush, Plaintiff appeared at a special-called meeting and advised the Board on the record that his resignation had already been withdrawn and that only the City Manager, not the Commission, had authority to accept or reject it. Nevertheless, Defendants Gregory, Powell, and Darnall, acting as a three-member majority, moved and voted to "accept" a resignation they knew had been rescinded, thereby purporting to terminate Plaintiff's contract and office in usurpation of the City Manager's executive power.

216.    Their vote was treated by the City as final and was never reviewed or reversed by any higher authority, making it the operative, final decision of the City for purposes of municipal liability.

217.     At the same time, this action was not a legislative act entitled to legislative immunity: Defendants were not enacting a generally applicable policy or prospective rule, but instead taking a targeted, adjudicative action against a single named individual outside their lawful remit. Their refusal to post the video or minutes of that special-called meeting—departing from the City's normal practice—further evidences that Defendants understood they were acting outside their legitimate legislative role and sought to conceal this retaliatory, non-legislative termination.

***Phil Williams and the NewsChannel 5 Defendants Continued Campaign of Disinformation and Support of Kim Kelley to Attack Plaintiff via January 14, 2025 Article.***

218.     The January 14, 2025 article titled *"Millersville Detectives Take Aim at Whistleblower in Federal Lawsuit"[3]* by Phil Williams, the article is riddled with intentional distortions, misquotations of the actual Complaint, and coordinated narrative manipulation, which constitute further acts in a concerted racketeering enterprise, a First Amendment retaliation scheme under 42 U.S.C. § 1983, and continued tortious interference with Plaintiffs' at-will employment.

219.     The January 14, 2025 article contains deliberate misquotation from the original Complaint that Plaintiff Kroll had filed for Dorris and Candler, reinforcement of known falsehoods, and a smear campaign framing of the lawsuit in at least the following ways:

    a.  Williams characterizes the "coordinated publicity stunt" between NewsChannel 5 and the TBI as "strange" or "baseless" without quoting or linking to the actual evidence provided.

---

[3] The article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/qanon-comes-to-main-street/millersville-detectives-facing-tbi-investigation-take-aim-at-whistleblower-in-federal-lawsuit

b. Williams does not provide a copy of the lawsuit for viewers to see, which is a standard practice. Williams does not provide a copy of the lawsuit to continue to launder evidence and intentionally skew the false narrative he and the other Defendants created.

c. While completely ignoring the bulk and core assertions in the Complaint, Williams focuses his article on two sentences regarding 9mm bullets to distort the context of the lawsuit and falsely suggest the Complaint is unserious or conspiratorial.

d. Williams again promotes the narrative that Dorris committed perjury, despite clear exculpatory language in the Complaint stating that detectives took over communications when they became criminal in nature and characterizing this as some sort of "new allegation" from the Detectives, when in fact their story never changed. Williams language suggests that their story is a false, post-hoc justification, when in fact their story and Det. Dorris's testimony has never changed on this point.

e. Williams selectively cites statements from Kim Kelley that have already been discredited by multiple eyewitnesses and video and audio evidence.

f. Williams falsely states that the "videos provided by Kelley corroborated her story," when those videos are edited, staged, and were shown to have occurred after the sting or at least at time when no other volunteers or officers are visible in the frame or can be heard in the background, thus strongly suggesting that they were taken after the sting was over, as the Complaint alleges.

g. Williams mischaracterizes the Complaint as an effort to attack a whistleblower, rather than what it is: a lawsuit seeking redress for defamation, constitutional violations, and coordinated retaliation.

220.    The January 14 article:

a. Reinforces the false political attribution that Plaintiffs were part of a conspiratorial, extremist movement;

b. Distorts and weaponizes legal filings to further discredit Plaintiff;

c. Furthers the retaliation scheme by portraying Plaintiff as an aggressor and discrediting his pleadings and his petitioning for access to the courts;

d. Was published with actual malice, as Williams has knowledge of the facts alleged in the Complaint, including that Kelley fabricated footage and that law enforcement officers conducted the communications with suspects.

221.    In an effort to defend against Det. Candler's claims about Williams' disclosure of his likeness, name, and affiliation with the Millersville Police Department, and to attack Plaintiff Kroll and impugn his reputation as a lawyer with false and defamatory allegations, Phil Williams falsely stated that a photo taken by Shawn Taylor on April 25, 2024, which included Plaintiff Kroll:

a. "shows Detective Candler posing during the planning meeting for the sting operation in Taylor's garage,"

b. and that this photo was "posted by the Millersville Police Department."

222.    In fact:

a. The photo was not posted by the Millersville Police Department;

b. It was a private Facebook post by Shawn Taylor on April 26, 2024, shared only with his personal friends;

c. Det. Candler was not identified or tagged, wore plain clothes and a cap pulled low over his face, and was not publicly recognizable as a police officer and was standing amidst multiple individuals who were not police officers;

d. The sting operation had not even been conceptualized at the time the photo was taken, and the meeting had nothing to do with the sting.

223. Despite repeatedly referring to her so-called "verifiable evidence" in public statements and broadcasts—including direct quotes featured in Phil Williams' January 14, 2025 article—Kim Kelley has refused for months to produce the unedited source material or supporting documentation for the claims she has made against Todd Dorris and Michael Candler. Plaintiff has specifically requested this evidence, yet Kelley has failed to provide even the most basic corroboration of her allegations. Instead, Kelley has attempted to divert attention from her evidentiary deficiencies by focusing obsessively on unrelated topics such as Veterans for Child Rescue (V4CR) and bizarre, irrelevant conspiracies concerning "the Moonies."

224. Kelley's failure to turn over the alleged "verifiable evidence" she so publicly touts—while simultaneously launching salacious and career-destroying accusations—demonstrates that no such evidence exists, or that she knows its full context would discredit her narrative. Rather than comply with reasonable disclosure requests, Kelley has engaged in a pattern of delay, distraction, and deception, including repeated attempts to use her political and media allies to amplify her claims without scrutiny.

225.     Furthermore, Kelley has communicated through an attorney who strategically refuses to confirm whether he actually represents her, a tactic seemingly designed to shield her from accountability while still engaging in quasi-legal posturing. During this period, Kelley and/or this proxy attorney have improperly copied Phil Williams on confidential and privileged communications with Plaintiff Kroll, a breach of ethical and professional norms that nonetheless demonstrates a coordinated relationship between a purported source and a journalist who has abandoned objectivity.

226.     Phil Williams has knowingly excluded all of these material facts from his ongoing coverage of the case, including Kelley's refusal to produce evidence, her irrelevant diversions, and her entanglement in privileged correspondence. Instead, Williams has published misleading and one-sided reports that portray Kelley as a whistleblower, thereby participating in a quid pro quo media kickback scheme wherein he promotes her public image in exchange for access to weaponized "leaks."

227.     This conduct by Kelley and Williams constitutes additional evidence of the malicious intent, actual malice, and reckless disregard for the truth that underlies Plaintiffs' claims of defamation, false light, tortious interference, and constitutional violations. It further supports Plaintiffs' claims that the media narrative was never rooted in fact, but in orchestrated retaliation and character assassination carried out by political actors and media surrogates acting in concert.

228.     In sum, the January 14, 2025 article published by Defendants Phil Williams and NewsChannel 5 and titled *"Millersville Detectives Take Aim at Whistleblower in Federal Lawsuit"* falsely and maliciously mischaracterized the factual allegations contained in the federal Complaint, deliberately misquoted portions of the filing, and reinforced discredited

narratives about Plaintiff, all while promoting Defendant Kim Kelley as a heroic "whistleblower" despite her proven role in fabricating and altering evidence.

229.     After Plaintiff's departure from Millersville, Defendant Phil Williams continued to inject himself directly into City affairs, abandoning any pretense of neutral reporting. Williams telephoned Interim City Manager Michael Gorham and expressly urged him to terminate Capt. Todd Dorris from the Millersville Police Department. Gorham refused, because he liked Dorris and saw no legitimate basis to fire him. Williams' attempt to pressure the City Manager to fire a specific officer—off the record, outside any formal process, and without evidence of wrongdoing—demonstrates that Williams was not investigating pre-existing matters of public concern, but was instead trying to manufacture personnel crises he could later exploit for his own "investigative" stories. This conduct is not journalism; it is further evidence that Williams was acting as a partisan actor and co-conspirator, seeking to fabricate news rather than report it.

## CAUSES OF ACTION

**COUNT I: First Amendment Retaliation – Speech, Petition, and Political Association**

**42 U.S.C. § 1983 (Against the City of Millersville and the Commissioner Defendants in their Individual Capacities)**

230.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

231.     At all relevant times, Plaintiff served as City Attorney for Millersville pursuant to a duly authorized contract at the same hourly rate previously paid to former City Attorney Jack Freedle, within an approved legal-services budget.

232.     During and before his service as City Attorney, Plaintiff engaged in extensive speech and petitioning activity on matters of public concern, including but not limited to:

a. Exposing public corruption, election fraud, misuse of reserve police commissions, and other unlawful conduct in Millersville;

b. Representing Mayor Tommy Long in an ouster lawsuit brought by the Templets and their allies, challenging the misuse of Tennessee's ouster statute to attack an elected mayor for reporting corruption and for his political alignment with the Sumner County Constitutional Republicans ("SCCR");

c. Filing and defending civil-rights cases, environmental enforcement actions, and other litigation—including the Shane Trucking/illegal dumping case and *Black et al. v. Millersville*—as vehicles for public accountability and protection of constitutional rights;

d. Advising the Millersville Board of Commissioners, in writing, that interrogating Assistant Chief Shawn Taylor about his off-duty political podcasts would expose the City to liability for violating the First Amendment;

e. Speaking at and around public meetings, and to the press, about corruption, misuse of office, environmental enforcement, law-enforcement reform, and the City's obligations under state and federal law.

233. Much of this speech and petitioning activity—particularly Plaintiff's representation of Mayor Long in the ouster action, his civil-rights and environmental cases, and his public comments before and after Commission meetings—was undertaken in Plaintiff's capacity as a private citizen, not pursuant to his official duties as City Attorney.

234. The Chancellor's disqualification order in the ouster lawsuit, on which Defendants repeatedly relied and quoted at the December 17, 2024 ambush, expressly states that "the

City is not a party or interested" in that action, and that Plaintiff's representation of Mayor Long occurred outside his City-Attorney role. Plaintiff did not bill the City for that work.

235.     Plaintiff's ouster advocacy, his civil-rights and environmental litigation, and his public comments to the press and at meetings were not tasks the City required him to perform in the specific time, place, and manner in which they occurred, and therefore constitute private-citizen speech.

236.     Even if any of Plaintiff's speech could be characterized as occurring in a work-related setting, the Commissioner Defendants themselves insisted that he was acting "as a personal attorney" and SCCR-aligned with various officials and "not for the City," and they punished him on that understanding. Retaliation based on the perceived exercise of private political rights is independently actionable under *Heffernan v. City of Paterson*, 578 U.S. 266 (2016).

237.     The subjects of Plaintiff's speech and petitioning—corruption, misuse of office, First Amendment compliance, environmental enforcement, PAC influence in local elections, law-enforcement reform, and the integrity of municipal governance—are classic matters of public concern under *Connick v. Myers* and its progeny. They concern how government officials conduct the public's business, spend public money, and respect constitutional rights.

238.     Plaintiff's use of litigation and public pleadings to frame these issues—particularly in the ouster case and in civil-rights and environmental suits—constitutes protected petitioning and political expression under Sixth Circuit and U.S. Supreme Court precedent.

239.     Plaintiff's interests in speaking and petitioning on these matters of public concern far outweigh any legitimate interest of the City in suppressing such speech. Plaintiff's

speech did not disrupt City operations, impair working relationships, or interfere with the efficient delivery of services; to the contrary, it was aimed at improving transparency, compliance, and public safety.

240.     The Commissioner Defendants—particularly Defendants Darnall, Powell, Gregory, and Templet—were aware of Plaintiff's protected speech and petitioning. They repeatedly referenced his representation of Mayor Long, his public defenses of Assistant Chief Taylor, his environmental enforcement work, and his perceived SCCR affiliation when attacking his integrity and seeking his removal.

241.     The Commissioner Defendants took multiple adverse actions against Plaintiff that would deter a person of ordinary firmness from continuing to engage in such speech and petitioning, including but not limited to:

    a.  Coordinating with Dustin Darnall's serial, baseless BPR complaints, which were then leaked to Phil Williams and used as fodder for negative coverage;

    b.  Publicly accusing Plaintiff of "conflicts of interest" and unethical conduct at Commission meetings and in coordinated media segments, while withholding or distorting exculpatory facts;

    c.  Orchestrating the December 17, 2024 "ambush" in which they proposed slashing Plaintiff's pay from $200/hour to $15/hour in a televised meeting, stripped him of duties, and cast his services as essentially worthless;

    d.  Creating conditions that forced Plaintiff to verbally tender a resignation in the heat of the attack, then ignoring his prompt rescission of that resignation and, at a subsequent special-called meeting, purporting to "accept" a resignation they knew had already been withdrawn;

e. Usurping the City Manager's authority to manage the City Attorney's contract and treating their ultra vires vote as final termination; and

f. Refusing to post the video or minutes of the special-called meeting in which they accepted a rescinded resignation, deviating from normal transparency practices and concealing their retaliatory actions from the public.

242. Termination (or forced resignation) from public employment, a drastic pay cut from $200/hour to $15/hour, and a sustained campaign of public smears and professional attacks easily qualify as adverse actions under Sixth Circuit law; they would deter an attorney of ordinary firmness from continuing to engage in similar speech and petitioning.

243. The Commissioner Defendants' retaliatory motive is evident from:

a. Their express references to Plaintiff's ouster advocacy and his defense of Taylor's First Amendment rights as reasons they were "not happy" with his representation and why his pay should be "amended down;"

b. The tight temporal proximity between Plaintiff's protected speech (including his public criticism of the ouster and his defenses of Taylor) and the adverse actions taken against him;

c. Their explicit alignment with the Templets' faction and stated desire to remove SCCR-aligned officials and attorneys from Millersville government; and

d. Their coordination with Phil Williams and other media actors to manufacture public outrage and build momentum for Plaintiff's removal.

244. At all relevant times, the City of Millersville, acting through its Board of Commissioners and City Manager, treated the December 17 ambush and the subsequent

"acceptance" of Plaintiff's rescinded resignation as final actions of the City with respect to Plaintiff's employment.

245.     The three-member majority of Defendants Darnall, Powell, and Gregory functioned, in this context, as final policymakers for the City concerning Plaintiff's appointment, compensation, and termination as City Attorney. Their decisions therefore constitute official policy of the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

246.     In the alternative, even if the Commission lacked formal authority to accept Plaintiff's rescinded resignation, the City ratified their actions by treating Plaintiff as terminated, hiring a replacement, and never correcting or repudiating the retaliation— thereby adopting their conduct as its own policy.

247.     The Commissioner Defendants' vote to "accept" Plaintiff's rescinded resignation was not a legislative act entitled to legislative immunity. It did not establish a prospective, generally applicable rule of conduct; it targeted a single individual for termination in an adjudicative, employment-related decision outside their lawful remit, in usurpation of the City Manager's executive authority.

248.     The City of Millersville and the Commissioner Defendants, acting under color of state law, intentionally retaliated against Plaintiff because of his protected speech, petitioning, and perceived political association, in violation of the First Amendment as incorporated through the Fourteenth Amendment.

249.     As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered lost income, loss of professional opportunities, reputational harm, emotional distress, and other damages in an amount to be proven at trial.

**COUNT II: First Amendment Retaliatory Conspiracy under 42 U.S.C. § 1983 – Joint**

**Action and Conspiracy Between State Actors and Media Defendants**

250.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

251.     Defendants Darnall, Templet, Powell, Gregory, Freedle, Blackburn, and the NewsChannel 5 Defendants (including Phil Williams, Levi Ismail, and their employer), together with other unnamed co-conspirators, reached an agreement and understanding to retaliate against Plaintiff for his protected speech, petitioning, and perceived political association by destroying his reputation and engineering his removal as City Attorney.

252.     The object of this agreement was to silence and punish Plaintiff for:

a.  Representing Mayor Tommy Long against the Templets' politically motivated ouster suit;

b.  Protecting Assistant Chief Shawn Taylor's First Amendment rights and supporting Taylor's efforts to expose corruption;

c.  Bringing and defending civil-rights and environmental suits that threatened powerful local interests;

d.  Opposing the return of the prior corrupt regime and its allies to power; and

e.  Being perceived as aligned with the SCCR faction in Sumner County politics.

253.     In furtherance of this conspiracy, Darnall:

a.  Filed at least six serial, baseless BPR complaints and supplements between January and June 2024, each timed to coincide with or immediately follow a NewsChannel 5 "investigative" segment targeting Plaintiff or Assistant Chief Taylor;

b. Leaked his complaints and Plaintiff's confidential responses to Phil Williams in violation of Rule 9's confidentiality provisions, so that Williams could selectively quote and mischaracterize them on air;

c. Coordinated scripted "citizen comments" at Commission meetings—such as the May 21, 2024 and December 17, 2024 meetings—knowing that Williams and a NewsChannel 5 camera crew would be present to capture them; and

d. Openly celebrated and amplified Williams's attacks on social media, praising the broadcasts as political victories against SCCR.

254.     In furtherance of the conspiracy, Templet:

a. Fed false and misleading information about Plaintiff's appointment and prior cases to Darnall for use in BPR complaints;

b. Forwarded Plaintiff's confidential legal opinions and City communications to Freedle for use in litigation and media outreach;

c. Co-authored and promoted the "Gregory/Templet Inquisition Letter" aimed at attacking Taylor's "mental competency" and prior political speech; and

d. Worked with Darnall and Powell to support measures designed to remove Plaintiff and restore the prior regime.

255.     In furtherance of the conspiracy, Freedle, as Templet and Gregory's agent/employee:

a. Filed a frivolous Open Meetings Act suit and a baseless ouster action on behalf of the Templets' family and business associates, targeting Mayor Long and the reform majority;

b. Shared unfiled draft pleadings and other materials with Darnall for inclusion in BPR complaints;

c. Filed his own BPR complaint on June 19, 2024 recycling disproven narratives, after Darnall ceased filing complaints following Plaintiff's contempt request; and

d. Used the disqualification order—which itself confirmed the City was "not a party or interested" in the ouster—as false "evidence" of a conflict in Plaintiff's City-Attorney role.

256. In furtherance of the conspiracy, the NewsChannel 5 Defendants, *inter alia*:

a. Produced and broadcast a series of one-sided "investigative" stories under sensational banners such as "QAnon Comes To Main Street" and "Hate Comes To Main Street," branding Plaintiff a "right-wing extremist" and falsely associating him with white supremacists and KKK members despite knowing his civil-rights record;

b. Falsely accused Plaintiff of having a "conflict of interest," of illegally generating LexisNexis reports for "conspiracy theories," and of telling the City "Don't investigate my client," while omitting or distorting exculpatory material that had been provided to them;

c. Coordinated with Darnall, Powell, Gregory, and Templet to time stories with public meetings and scripted attacks, including bringing cameras and microphones in anticipation of specific ambushes;

d. Published the December 18, 2024 article openly celebrating that "his controversial tenure as city attorney was also finished," revealing that Plaintiff's removal was the intended outcome of the coverage; and

e. Reposted and amplified their own and each other's stories on social media to maximize reputational harm and political pressure.

257. The Commissioner Defendants knowingly cooperated with the NewsChannel 5 Defendants and the other private co-conspirators by, *inter alia*:

a. Using the talking points and accusations aired by Williams as the basis for official actions against Plaintiff;

b. Staging the December 17, 2024 pay-cut ambush in front of NewsChannel 5 cameras and then voting, at a special-called meeting, to "accept" Plaintiff's rescinded resignation; and

c. Citing prior NewsChannel 5 "investigations" as justification for reducing Plaintiff's pay, eliminating his duties, and effectively terminating his contract.

258. At all relevant times, the private co-conspirators acted "under color of state law" because they jointly participated with state officials in a coordinated plan to deprive Plaintiff of his First Amendment rights, and the state actors used their governmental authority to give effect to the scheme.

259. Under well-settled conspiracy principles, each conspirator is liable for the constitutional injuries caused by any other conspirator acting in furtherance of the common plan.

260. The combined actions of the state and private conspirators—serial BPR abuse, coordinated leak-based media attacks, scripted ambushes at public meetings, and the engineered termination of Plaintiff's City-Attorney position—were part of a single, continuous plan and overt acts in furtherance of the common conspiratorial objective, that were undertaken because of Plaintiff's protected speech, petitioning, and perceived

political association, and would deter a person of ordinary firmness from engaging in similar activities. Accordingly, each private participants are liable under Section 1983 for the constitutional injuries inflicted by their state-actor co-conspirators.

261.     As a direct and foreseeable result of this retaliatory conspiracy, Plaintiff lost his City-Attorney position, suffered severe reputational and professional harm, and incurred economic and non-economic damages in an amount to be proven at trial.

262.     Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's clearly established First Amendment rights, warranting an award of punitive damages against the individual and private defendants to the extent permitted by law.

**COUNT III: Tortious Interference with Contract and Business Relationships**

**(Against Defendants Phil Williams and NewsChannel 5 / E.W. Scripps)**

263.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

264.     At all relevant times, Plaintiff had an existing, valid contractual relationship with the City of Millersville to serve as City Attorney at an hourly rate of $200, and a continuing business relationship and expectancy of ongoing work under that agreement, including future renewals, litigation assignments, and related legal services for the City and its officers. These Defendants were also aware that Plaintiff maintained a private practice with other clients.

265.     Defendants Phil Williams, Levi Ismail, and NewsChannel 5 had full knowledge of Plaintiff's contractual and business relationship with the City. Williams repeatedly described Plaintiff on air and in print as "the city attorney," discussed his pay rate and budget line item, and framed multiple stories around whether the City should "keep" or "fire" him.

266.     Acting with the predominant purpose of injuring Plaintiff and severing his relationship with the City, Williams and NewsChannel 5 intentionally interfered with that contract and expectancy. Their interference was motivated in substantial part by Williams's longstanding friendship with Plaintiff's former law partner, W. Gary Blackburn, with whom Plaintiff was in a bitter partnership dispute, and by Williams's desire to retaliate on Blackburn's behalf and to gratify the political objectives of Dustin Darnall, Cristina Templet, and other local actors opposed to Plaintiff's reform efforts.

267.     Williams', Ismail's, and NewsChannel 5's interference was accomplished through improper means and motives as recognized by Tennessee law, including: (a) defamation and defamation by omission; (b) unfounded and misleading "investigations" that falsely accused Plaintiff of ethical violations and criminal misconduct; (c) misuse of inside and confidential information, including BPR complaints and responses, as well as background reports and materials that Shawn Taylor had previously provided to Williams and Levi Ismail in confidence as a source; and (d) unethical conduct in violation of established journalistic standards, including the ethical code adopted by E.W. Scripps for its reporters and stations.

268.     Among other things, Williams: (a) falsely suggested that Plaintiff had "hacked" or otherwise misused his former law firm's LexisNexis credentials; (b) repeatedly and misleadingly asserted that Plaintiff had an undisclosed "conflict of interest" as City Attorney; (c) accused Plaintiff of telling the City "don't investigate my client" while omitting the portions of Plaintiff's email and public statements that made clear he was warning about First Amendment liability, not obstructing any investigation; and (d) branded Plaintiff a "right-wing extremist" under a "Hate Comes to Main Street" series,

falsely associating him with white supremacists and KKK members despite knowing Plaintiff's civil-rights record.

269. Williams, Ismail, and NewsChannel 5 knowingly used confidential BPR materials—supplied to Williams by Dustin Darnall in violation of Rule 9's confidentiality provisions—as a central narrative device in their broadcasts, selectively quoting and distorting Plaintiff's responses while omitting exculpatory context. This constitutes misuse of confidential information and "sharp dealing" in violation of an established standard of their trade and profession, and falls squarely within the examples of "improper means" recognized by Tennessee courts.

270. Williams also entered into, an in-kind quid pro quo arrangement with Darnall and other local actors: Darnall supplied serial BPR complaints, leaks, and scripted performances at public meetings to give Williams sensational content; in return, Williams amplified Darnall as a "concerned citizen," attacked Plaintiff's integrity, and pressured the Commission to take "official action" against him. This coordinated use of leaked complaints and choreographed on-camera ambushes amounted to the functional equivalent of an illegal in-kind contribution or bribe in exchange for official action—namely, the December 17, 2024 vote to slash Plaintiff's pay from $200/hour to $15/hour and to force his resignation.

271. Williams's December 18, 2024 article, which declared that "his controversial tenure as city attorney was also finished," and celebrated the December 17 ambush as a "fresh start" for Millersville, was the culmination of this campaign. By that point, Williams and NewsChannel 5 had repeatedly and intentionally inflamed public opinion against Plaintiff, supplied talking points to his political opponents, and created the very climate of

hostility they then reported upon—specifically to induce the City to terminate Plaintiff's contract.

272.      Under Tennessee law, conduct is "improper" for purposes of tortious interference when it is illegal, independently tortious, in violation of statutes or professional standards, or involves fraud, misrepresentation, defamation, misuse of inside information, or other unethical practices.

273.      Williams's, Ismail's, and NewsChannel 5's conduct—defamation, knowing falsehoods, concealment of exculpatory facts, misuse of confidential BPR materials and source documents, sharp dealing, and orchestrated media pressure to secure an adverse official act—meets and exceeds these standards for improper motive and means.

274.      As a direct and proximate result of Defendants Williams's, Ismail's, and NewsChannel 5's intentional and improper interference, the City of Millersville, acting through its Board of Commissioners, breached or constructively terminated Plaintiff's contract, "accepted" a rescinded resignation, and ended Plaintiff's ongoing business relationship with the City, causing Plaintiff to suffer substantial economic damages, loss of future business opportunities, and severe harm to his professional reputation.

275.      Defendants' coordinated attacks did not merely strip Plaintiff of the Millersville City Attorney position, but also torpedoed his private law practice. By branding Plaintiff a "conflicted," "unethical," and "extremist" attorney affiliated with hate groups in highly public broadcasts and meetings, and by repeatedly suggesting he was under professional investigation, Defendants poisoned his reputation in the very community that had been his primary client base for years. Existing and prospective clients reasonably feared that retaining Plaintiff would draw media scrutiny or political retaliation, referrals dried up, and

several matters were either cancelled or never retained at all. In this way, Defendants' tortious interference extended beyond his municipal contract and effectively destroyed the goodwill and economic viability of Plaintiff's private practice.

276.     Defendants' conduct was malicious, willful, and in reckless disregard of Plaintiff's rights, and warrants an award of punitive damages under Tennessee law.

## COUNT IV: Defamation

### (Against Media Defendants and Individual Defendants)

277.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

278.     At all relevant times, the Media Defendants owned, operated, or appeared as on-air talent for NewsChannel 5 and its related digital platforms, and the Individual Defendants used social media, podcasts, public meetings, and other fora to publish statements about Plaintiff.

279.     Defendants published numerous false statements of fact about Plaintiff, orally and in writing, including but not limited to:

    a.  Stating or clearly asserting that Plaintiff had an actual, undisclosed "conflict of interest" as City Attorney because he was "suing Millersville" at the same time he represented the City, when in fact no litigation of Plaintiff's against Millersville was pending when he was appointed City Attorney, and the Chancellor's disqualification order in the ouster case expressly states that "the City is not a party or interested" in that lawsuit.

    b.  Stating that Plaintiff "advised his client, the City of Millersville, not to investigate his other client, conspiracy cop Shawn Taylor," or similar variants (e.g., "Don't investigate my client"), when Plaintiff never wrote or said those words and, in

context, expressly advised the Board only that a *particular* special-called meeting framed around Taylor's political speech would expose the *City* to First Amendment liability.

c.  Stating that Plaintiff "admitted he generated reports used by conspiracy cop Shawn Taylor" and that he "used his old law firm's accounts" to fuel "bizarre conspiracy theories," thereby implying that Plaintiff had improperly or unlawfully accessed LexisNexis credentials of his former firm, when in fact the reports at issue were run legitimately during his prior employment, long before he became City Attorney, and were later shared by clients and by Taylor himself.

d.  Asserting or clearly implying that Plaintiff committed or facilitated criminal or unethical conduct, including "hacking" or misusing law-firm systems, misusing LexisNexis, or obstructing investigations, despite the absence of any such findings and despite Plaintiff twice passing LexisNexis credentialing audits triggered by the broadcasts.

e.  Branding Plaintiff a "right-wing extremist," placing coverage about him under the "QAnon Comes to Main Street" and/or "Hate Comes to Main Street" series, and falsely associating him with white supremacists and KKK members, despite knowing that Plaintiff has spent his career as a civil-rights attorney, served on a Civil Rights Cold Cases Committee investigating lynchings of African Americans, and prosecuted cases against suspected KKK affiliates.

f.  Characterizing Plaintiff as a dishonest, unethical lawyer.

g. Repeating and publishing statements that Plaintiff was misusing public resources for "conspiracy theories," when Defendants knew or recklessly disregarded that these assertions were false or grossly misleading.

280. These statements were published to third parties—including NewsChannel 5's television and online audience, podcast listeners, social-media followers, and attendees at public meetings—and were "of and concerning" Plaintiff, who was repeatedly identified by name, title, and photograph.

281. The statements are false. Plaintiff did not: (a) maintain any concurrent litigation against Millersville while serving as City Attorney; (b) tell the City "not to investigate" Shawn Taylor; (c) hack or misuse former firm credentials; (d) obstruct any legitimate investigation; or (e) affiliate with white supremacists or "hate" groups. To the extent any statement mixed fact and opinion, Defendants implied the existence of undisclosed defamatory facts that did not exist.

282. Defendants published and republished these statements at least negligently and, in many instances, with actual malice—that is, with knowledge of falsity or reckless disregard for the truth. Among other things:

a. The Media Defendants had Plaintiff's emails, BPR responses, and the Chancellor's order in their possession, all of which contradicted the conflict-of-interest and "don't investigate my client" narratives, yet they omitted or distorted those materials.

b. Williams and Ismail had previously received documents and messages from Shawn Taylor in 2023 showing that Taylor, not Plaintiff, provided them the background

reports, and that Taylor told them he had LexisNexis access, yet they falsely framed Plaintiff as the source.

c. Defendants knew of Plaintiff's civil-rights record—including *Black et al. v. Millersville*—because they had reported on it, yet nonetheless branded him as aligned with "hate" and "extremism."

d. Several Individual Defendants (including Darnall, Templet, and Gregory) made statements from prepared scripts at meetings and in media appearances, timed to coincide with NewsChannel 5 stories, confirming the deliberate and calculated nature of the false charges.

283. Many of the challenged statements are defamatory *per se* because they impute to Plaintiff conduct incompatible with his profession—dishonesty, ethical breaches, conflicts of interest, criminal hacking or misuse of confidential systems, racism, and support of "hate" movements—thus inherently harming his reputation as an attorney.

284. As a direct and proximate result of Defendants' defamatory statements, Plaintiff has suffered severe reputational harm, loss of employment as City Attorney, lost business opportunities, emotional distress, humiliation, and other damages in an amount to be proven at trial.

285. Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's rights, warranting an award of punitive damages to the extent permitted by law.

### COUNT V: Defamation by Implication / Defamation by Innuendo

### (Against Media Defendants and Individual Defendants)

286. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

287. In addition to the express false statements described above, Defendants published words, headlines, images, and narratives that, when taken together and viewed in context, conveyed false and defamatory implications about Plaintiff's character and conduct.

288. Defendants selected and arranged true and partially true statements, omitted critical exculpatory facts, and paired those omissions with suggestive language in a manner intended—and reasonably understood by viewers and readers—to communicate false, defamatory messages, including but not limited to the following implications:

    a. That Plaintiff had secretly and recently "hacked" or stolen his former law firm's LexisNexis credentials to generate "conspiracy" reports for Shawn Taylor, rather than the truth: that any reports were run lawfully during his prior employment and later shared by others.

    b. That Plaintiff was currently and actively abusing his role as City Attorney to protect a "conspiracy cop," obstruct investigations, and cover up misconduct, when his actual advice warned the City *against* unconstitutional retaliation and his litigation advocacy occurred in a separate, private capacity.

    c. That Plaintiff was effectively part of a "QAnon" or "hate group" movement and aligned with white supremacists and KKK members, by repeatedly placing him within series branded "QAnon Comes to Main Street" and "Hate Comes to Main Street," juxtaposing his image and name with coverage of extremists, while omitting his civil-rights record that directly contradicted that narrative.

    d. That Plaintiff's City-Attorney contract and pay were illegitimate and self-dealing ("tripled legal budget," "never approved," "$100,000 city attorney"), implying corruption or grift, while omitting the facts that his rate matched the prior City

Attorney's, fit within an approved budget, and was later quietly paid to his successor.

   e.  That Plaintiff had somehow abandoned his post or stormed off in a fit of pique on December 17, 2024, "finishing" his own "controversial tenure," while omitting that he promptly rescinded his resignation, sought to protect the citizens from a legal vacuum, and was ultimately forced out through an ultra vires vote.

289.    Defendants intended these implications, or at minimum knew that their presentations were reasonably capable of conveying such meanings and proceeded in reckless disregard of that risk. Their headlines, series branding, editing choices, and pointed omissions were crafted to lead viewers to the defamatory inferences described above.

290.    Reasonable viewers and readers in the community in fact understood the publications to convey those defamatory implications, as evidenced by subsequent public commentary, social-media reactions, and the use of these narratives by political opponents to justify Plaintiff's removal.

291.    These defamatory implications injured Plaintiff in the same ways as the express statements: they falsely portrayed him as unethical, dishonest, corrupt, bigoted, and unfit to practice law or hold public office, thereby causing grave reputational, professional, and emotional harm.

292.    Defendants acted with actual malice in creating and disseminating these defamatory implications: they possessed contrary information, deliberately omitted it, and used inflammatory framing to push a preconceived storyline designed to destroy Plaintiff's reputation and employment.

293.     Plaintiff is entitled to recover actual and punitive damages for Defendants' defamation by implication in an amount to be determined at trial.

## COUNT VI: False Light Invasion of Privacy

### (Against Media Defendants)

294.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

295.     Under Tennessee law, a defendant commits false light invasion of privacy by giving publicity to a matter concerning another that places the other before the public in a false light that would be highly offensive to a reasonable person, where the defendant knew of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

296.     The Media Defendants widely publicized stories, broadcasts, headlines, graphics, and online content that placed Plaintiff in a false light before the public, including but not limited to:

    a. Portraying Plaintiff as a "right-wing extremist" and featuring him within "QAnon Comes to Main Street" and "Hate Comes to Main Street" series, alongside stories about extremist and racist groups, thereby suggesting he shared their ideology or was part of their movement.

    b. Casting Plaintiff as a corrupt, unethical attorney who orchestrated conflicts of interest, misused confidential systems, and obstructed investigations, through repeated references to "conspiracy cop," "bizarre conspiracy theories," "rebuke from a local judge," and "unapproved" legal fees.

    c. Depicting Plaintiff as someone who interfered with or jeopardized a child-predator sting and defended dangerous offenders, by suggesting he had no "evidence" that a

suspect was a serial child rapist and implying he was more concerned with protecting "conspiracy" narratives than with public safety.

    d.   Presenting Plaintiff's forced removal as a voluntary, deserved end to a "controversial tenure," framing the December 17, 2024 ambush and subsequent coverage as a "fresh start" for Millersville because he was gone.

297.    The overall portrayal of Plaintiff—as a racist extremist, corrupt lawyer, and unethical public official—was false and grossly misleading. In reality, Plaintiff is a civil-rights attorney who has litigated on behalf of Black plaintiffs, served on a Civil Rights Cold Cases Committee investigating lynchings, and consistently advocated for constitutional compliance, environmental protection, and honest government.

298.    Being publicly depicted as akin to a white supremacist or KKK sympathizer, as an unethical lawyer, or as a corrupt public official would be highly offensive to a reasonable person—especially one whose professional identity and livelihood depend on integrity and civil-rights advocacy.

299.    The Media Defendants knew, or acted in reckless disregard of the fact, that this composite portrayal was false and that their reporting placed Plaintiff in a grossly inaccurate and stigmatizing light. They possessed information directly contradicting the image they projected—Plaintiff's prior civil-rights work, the contents of his emails and BPR responses, and the true timeline of Taylor's documents—yet chose to ignore or bury those facts.

300.    The false light in which Defendants placed Plaintiff was not only deeply humiliating but also had concrete adverse consequences: it fueled public outrage, justified

political retaliation, and materially contributed to the termination of his City-Attorney position and the diminishment of his professional standing.

301.    As a direct and proximate result of this false-light publicity, Plaintiff has suffered emotional distress, mental anguish, reputational harm, and economic loss in an amount to be proven at trial.

302.    Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's rights, warranting an award of punitive damages to deter similar conduct in the future.

## COUNT VIII:  Civil Conspiracy (State Law)

## (Against Commissioner and Former Commissioner Defendants in Their Individual Capacities)

303.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

304.    At all relevant times, Defendants Dustin Darnall, Jesse Powell, David Gregory, Cristina Rosado Templet, and other current or former Millersville commissioners (collectively, the "Commissioner Defendants") acted in their individual capacities and under color of their public positions to target Plaintiff's employment, professional reputation, and contractual/business relationships.

305.    Under Tennessee law, a civil conspiracy is "a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means." A conspiracy is not an independent tort, but a mechanism by which each conspirator is held liable for the underlying torts committed in furtherance of the agreement.

306.    Plaintiff alleges that the Commissioner Defendants entered into a single, continuing agreement and understanding to remove Plaintiff as City Attorney and to destroy his

professional reputation because of his protected advocacy and political alignment with the reform administration and perceived association with the Sumner County Constitutional Republicans ("SCCR").

307.     The Commissioner Defendants shared a general conspiratorial objective:

    a.  To retaliate against Plaintiff for his representation of Mayor Tommy Long in the ouster case, his defense of Assistant Chief Shawn Taylor's First Amendment rights, and his efforts to expose corruption and misuse of office in Millersville;

    b.  To discredit Plaintiff publicly as unethical, conflicted, and "extreme," thereby undermining his ability to continue serving as City Attorney or to obtain comparable public work; and

    c.  To clear the way for the return or empowerment of their preferred political faction by removing Plaintiff as an obstacle.

308.     In furtherance of this conspiracy, the Commissioner Defendants engaged in multiple overt acts, including but not limited to:

    a.  Working with and through Dustin Darnall to generate serial, baseless BPR complaints against Plaintiff, timed to coincide with NewsChannel 5 broadcasts and then leaked to Phil Williams for use in smear pieces;

    b.  Coordinating with attorney Jack Freedle to weaponize the Open Meetings Act lawsuit and ouster case against Mayor Long, including using the disqualification order—despite its plain language that the City was not a party—as a talking point to falsely accuse Plaintiff of "conflicts of interest" as City Attorney;

    c.  Drafting, promoting, and theatrically deploying the "Gregory/Templet Inquisition Letter" questioning Shawn Taylor's "mental competency" and political beliefs, and

using Plaintiff's legal advice about the First Amendment as a pretext to attack his ethics and loyalty to the City;

d. Repeating and endorsing the Media Defendants' narratives at public meetings and in interviews—such as claiming the legal budget had "tripled," that Plaintiff's rate was "never approved," and that he was "suing Millersville while serving as City Attorney"—despite knowing these statements were false or grossly misleading;

e. Orchestrating the December 17, 2024 ambush at the first meeting of the new Commission by placing the "City Attorney pay" issue on the agenda, inviting NewsChannel 5 to film the confrontation, and using scripted remarks to justify slashing Plaintiff's pay from $200/hour to $15/hour in front of the cameras;

309. These concerted actions were carried out through unlawful means and for an unlawful purpose, including:

a. Defamation and defamation by implication (branding Plaintiff as conflicted, unethical, dishonest, and aligned with "hate" and "extremism");

b. False light invasion of privacy (placing Plaintiff before the public in a grossly misleading and highly offensive light);

c. Tortious interference with contract and business relationships (intentionally inducing the City to breach or terminate Plaintiff's City-Attorney contract and to sever future work); and

d. Abuse of process / misuse of regulatory processes, including the serial, bad-faith exploitation and leaking of confidential BPR proceedings to generate media pressure and political leverage.

310.     The Commissioner Defendants conspiracy is evidenced by their coordinated timing with the Media Defendants, shared talking points, repetitive use of each other's allegations, and synchronized actions at public meetings and in litigation to bring about Plaintiff's professional destruction.

311.     Each Commissioner Defendant knew of the general nature and purpose of the common plan and voluntarily participated in it, and each is therefore jointly and severally liable for all tortious acts committed by any co-conspirator in furtherance of the conspiracy.

312.     As a direct and proximate result of this civil conspiracy, Plaintiff was forced from his position as City Attorney, deprived of contractual rights and expected future work, and subjected to severe reputational, professional, and emotional harm. Plaintiff has suffered, and continues to suffer, damages in an amount to be proven at trial.

313.     The Commissioner Defendants' conduct was malicious, willful, and in reckless disregard of Plaintiff's rights, warranting an award of punitive damages under Tennessee law.

## DAMAGES

314.     Plaintiff brings this suit for all damages recoverable under Tennessee and federal law.

315.     Plaintiff seek an award of punitive damages against the Defendants, jointly and severally, for the Defendants' intentional, reckless, malicious and fraudulent conduct in an amount sufficient to punish the Defendants wrongful conduct and to deter the Defendants and others from similar misconduct in the future.

316.     Plaintiff has also suffered emotional distress and mental anguish as a direct result of Defendants' smear campaign. Long–standing friendships and professional relationships

have fractured, as acquaintances and colleagues—exposed only to Defendants' distorted coverage—have distanced themselves or treated Plaintiff with suspicion. Following the most inflammatory broadcasts, Plaintiff received dozens of death threats and menacing messages from NewsChannel 5 viewers all over the United States, some explicitly invoking the narratives Defendants manufactured. These threats have forced Plaintiff to live in a state of heightened vigilance, to modify his routines, and to maintain increased security and readiness at his home and office. His sleep, peace of mind, and sense of safety have been severely disrupted, causing ongoing anxiety, stress, and mental anguish for which he is entitled to recover damages.

317.    Plaintiff has experienced and will continue to experience damages to his person, business interests, and property interest, including, but not limited to the following:

    a.  Lost wages,

    b.  Out-of-pocket expenses,

    c.  Damage to professional reputation,

    d.  Loss of career opportunities and future career opportunities,

    e.  Loss of case productivity effecting performance evaluations, promotions, and continued employment in specialized roles;

    f.  Exclusion from professional circles;

    g.  Inability to work in specialized roles;

    h.  Loss of standing in the law enforcement community;

    i.  Loss of professional standing and the economic value of professional standing;

    j.  Loss of earnings potential in current and future employment;

k. Loss of cases and investigative files, which is a unique form of intellectual and professional property in the field of law enforcement;

l. Increased likelihood of early retirement or termination due to the false allegations and subsequent fallout, directly impacting the benefits accruing through continued employment, including benefits, accrued leave, and retirement contributions;

m. Loss of professional equipment and resources, including access to investigative tools necessary for fulfilling their roles, further diminishing their property interests in their assigned work;

n. Devaluation of professional credentials, which carry value in employment or consulting opportunities, due to the false allegations of the Defendants

o. Damages for mental anguish and emotional distress;

p. Damages for loss of goodwill and public trust;

q. Damages for professional isolation leading to financial and career setbacks; and

r. Increased legal and financial burdens, including legal costs for representation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in his favor and against all Defendants, jointly and severally where appropriate, and award the following relief:

1. That process issue, requiring the Defendants to answer in the time prescribed by law;

2. An award of compensatory damages for Plaintiff's economic, reputational, and emotional injuries on each federal cause of action (including all First Amendment and § 1983 conspiracy claims) in an amount to be determined by the jury, but not less than Ten Million Dollars ($10,000,000.00) per Count, including an award of not less than Fifteen Million

Dollars ($15,000,000.00) against Defendant City of Millersville on the § 1983 claims, or such greater amount as the jury may find appropriate.

3. An award of compensatory damages on each state law claim (including tortious interference, defamation, defamation by implication, false light, and civil conspiracy) in an amount to be determined by the jury, but not less than Ten Million Dollars ($10,000,000.00) per Count, or such greater amount as the jury may find appropriate.

4. An award of punitive and exemplary damages against all non-municipal Defendants and private Defendants, in their individual and/or corporate capacities, in an amount equal to or greater than the compensatory damages awarded on each Count-i.e., not less than Ten Million Dollars ($10,000,000.00).

5. An award of punitive damages in the amount of One Dollar ($1.00) per view for any of the Media Defendants' publications or broadcasts involving or mentioning Plaintiff, or One Hundred Million Dollars ($100,000,000.00), whichever is greater, in order to punish and deter willful, malicious, and reckless disregard of Plaintiff's rights as part of one of the largest fake news campaigns in history.

6. A declaration that Defendants' conduct, as alleged herein, violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution, and that the serial BPR abuse, orchestrated media attacks, and ultra vires actions of the Commissioner Defendants were unlawful and retaliatory.

7. Appropriate injunctive relief as the Court deems just and proper, including but not limited to orders:

a. Prohibiting the City and its officials from enforcing or relying upon the unlawful "acceptance" of Plaintiff's rescinded resignation as a basis to bar him from future municipal employment;

b. Requiring correction or retraction of specific false and defamatory statements to the extent feasible; and/or

c. Any further equitable relief necessary to restore Plaintiff, as nearly as possible, to the position he would have occupied absent Defendants' unconstitutional and tortious conduct.

8. An award of Plaintiff's reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. §1988 and other applicable law, together with all taxable costs of this action.

9. An award of pre-judgment and post-judgment interest at the maximum rate allowed by law.

10. Such other and further legal or equitable relief as this Court deems just, proper, and necessary under the circumstances.

**Plaintiff demands a trial by jury for all issues so triable.**

Respectfully submitted,

_/s/ James W. Cobb_
James W. Cobb (#033248)
Cobb Law Group
131 Walton Ferry Road
Suite 11
Hendersonville, TN 37075
James@CobbLawTn.com
Office: (615) 649-0049

*Attorney for Plaintiff*